UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Mehdijaffer Allyakber Mulla,<br><br>Plaintiff,<br><br>v.<br><br>The University of Minnesota, the Regents of the University of Minnesota, Michael Kim, and Julia Weston,<br><br>Defendants. | Case No. 20-cv-931 (SRN/LIB)<br><br>**ORDER ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

James Robbins, Kowitz Law, P.O. Box 598, Lindstrom, MN 55045, for Plaintiff

Carrie Ryan Gallia, University of Minnesota, Office of the General Counsel, 360 McNamara Alumni Center, 200 Oak Street SE, Minneapolis, MN 55455, for Defendants the University of Minnesota, the Regents of the University of Minnesota, and Michael Kim

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on the Motion for a Temporary Restraining Order ("TRO") and Preliminary Injunction [Doc. No. 15] filed by Plaintiff Mehdijaffer Allyakber Mulla. The parties appeared for a hearing by teleconference on August 31, 2020 before the undersigned judge. For the reasons set forth below, the Court denies Plaintiff's motion.

**I.    BACKGROUND**

In April 2020, Plaintiff filed this case against the University of Minnesota, the Regents of the University of Minnesota, and Michael Kim (collectively, "the University Defendants"). (Complaint [Doc. No. 1].) Mulla alleges constitutional violations of due

process and equal protection under 42 U.S.C. § 1983, as well as state law claims for defamation, breach of contract, intentional infliction of emotional distress, and negligent infliction of emotional distress. On August 23, 2020, Mulla filed the instant motion, seeking a TRO or preliminary injunction.[1]

After Defendants filed a motion to dismiss on August 3, 2020, Mulla responded on August 26, 2020 with the Amended Complaint [Doc. No. 23-2].[2] (*See* Text Only Order [Doc. No. 24].) As set forth in the pleadings, Mulla, a Minnesota resident, has attended the University of Minnesota's Medical School ("the Medical School") in the past. (Am. Compl. ¶¶ 9, 44.) The University of Minnesota's Board of Regents is the University's governing board, (*id.* ¶ 10), Michael Kim is the Medical School's Assistant Dean for Student Affairs, (*id.* ¶ 12), and Julia Weston is the Student Representative for the Medical School's Committee on Student Scholastic Standing ("COSSS"). (*Id.* ¶ 13.)

The COSSS is charged with monitoring the progress of medical students, following the Medical School's policies and procedures (Gallia Decl. [Doc. No. 26], Ex. A (July 30, 2016 Univ. of Minn. Policies & Procedures of the COSSS) at 2–3.) Graduation requirements are among the policies and procedures by which the members of the COSSS monitor students' academic performance and related issues. (*Id.* at 3.) Medical students

---

[1] Because the University Defendants have responded to the motion, the Court construes it as a motion for a preliminary injunction.

[2] Although the Amended Complaint was not the operative pleading at the time Mulla filed the instant motion, the Court refers to it throughout this Order when citing to the pleadings, as it is now the operative pleading. The primary difference between the Complaint and the Amended Complaint is the addition of Defendant Julia Weston in the amended pleading, which does not affect the analysis here.

must demonstrate proficiency in nine areas of competency in order to graduate: (1) patient care; (2) knowledge for practice; (3) practice-based learning and improvement; (4) interpersonal and communication skills; (5) professionalism; (6) systems-based practice; (7) interprofessional collaboration; (8) personal and professional development; and (9) scientific and clinical inquiry.  Univ. of Minn. Medical School, *Competencies Required for Graduation* (July 2019) https://med.umn.edu/md-students/academics/competencies-required-graduation.  Students may be dismissed from the Medical School for academic deficiencies, which include "[e]gregious or repetitive professionalism concern(s) in academic, clinic, or other related professional settings." (Gallia Decl., Ex. A (July 30, 2016 Univ. of Minn. Policies & Procedures of the COSSS) at 11.)

Mulla entered the Medical School in the fall of 2016.  (*See* Pl.'s Ex. 14 [Doc. No. 17-1 at 86]; Pl.'s Ex. 23 [Doc. No. 17-1 at 145].)  In 2017, the COSSS suspended Mulla from the Medical School for violating certain policies, after the University's Office for Equal Opportunity and Affirmative Action ("EOAA") had conducted an investigation. (Am. Compl. ¶ 17.)

In July 2019, Mulla appeared before the COSSS to request reinstatement.  (*Id.*) Finding that he had demonstrated rehabilitation, the COSSS readmitted Mulla to the Medical School on the condition that "any further professionalism concern will result in your immediate suspension and dismissal hearing," along with other conditions.  (*Id.* ¶ 18.) Mulla resumed his studies at the Medical School in the fall of 2019.  (*Id.* ¶ 19.)

In November 2019, Medical School students reported new allegations involving Mulla to Assistant Dean for Student Affairs Dr. Michael Kim.  (*Id.* ¶¶ 19–20.)  Mulla

3

alleges that these allegations were "false," and subsequently, Dr. Kim solicited additional complaints from the student body via email. (*Id.*) On November 14, 2019, Dr. Kim suspended Mulla from the Medical School. (*Id.* ¶ 21.) He informed Mulla that the Medical School had received reports from "multiple students" who raised concerns that "[Mulla] ha[d] exhibited unprofessional behavior." (Pl.'s Ex. 4 [Doc. No. 17-1 at 51].) In accordance with the provisions of Mulla's fall 2019 reinstatement, and because of the new professionalism concerns, the Medical School suspended Mulla. (*Id.*)

The University's EOAA Office conducted an investigation into the students' allegations, which included "reports of sexual misconduct," to determine if the conduct constituted a violation of the University's Student Conduct Code regarding sexual harassment. (Am. Compl. ¶ 22.) Mulla alleges that the EOAA failed to advise him of the allegations, delayed interviewing critical witnesses, and violated its own guidelines without allowing a response to any allegation. (*Id.* ¶ 23.)

Nonetheless, Mulla alleges that "[t]he EOAA conducted a detailed and lengthy investigation that lasted over 200 days," culminating in a 44-page report, issued in June 2020. (*Id.* ¶ 36; Pl.'s Ex. 2 [Doc. No. 17-1].) The EOAA found insufficient evidence to establish that Mulla had engaged in sexual or gender-based harassment in violation of the University's Student Conduct Code. (Pl.'s Ex. 2 [Doc. No. 17-1 at 43–47].) However, the EOAA found, as a factual matter, that Mulla "sent unwelcome social media messages to five Complainants in September, October, and November 2019" and that he had numerous unwelcome in-person interactions with certain classmates. (*Id.* at 36–45.)

In July 2020, the COSSS held a hearing to determine whether Mulla's conduct warranted any sanctions. (Pl.'s Ex. 15 [Doc. No. 17-1 at 91].) At the July 23, 2020 hearing, conducted via Zoom, Mulla provided a personal statement to the COSSS, and witnesses provided testimony. (Am. Compl. ¶ 42.) The hearing, scheduled for one hour, extended past the allotted time. (*Id.* ¶ 43.) Mulla was represented by counsel at the hearing, although he alleges that his counsel was "cut off" by the COSSS chair during cross examination of witnesses. (*Id.*)

On August 18, 2020, the COSSS issued a decision letter to Mulla, which fully recounted the hearing process and procedures. (Pl.'s Ex. 15 [Doc. No. 17-1 at 90–97].) It noted that Mulla had received written notice of the hearing, and was represented by counsel. (*Id.* at 91.) It further observed that the hearing was recorded, counsel gave opening statements, Mulla read from a prepared statement and answered questions from the committee, written materials were submitted, and two Medical School students testified as witnesses regarding their concerns about Mulla's conduct. (*Id.* at 92–94.) The COSSS concluded that Mulla's conduct was deficient with regard to the competency requirement of professionalism, necessary for graduation. (*Id.* at 95.) It stated:

> The committee carefully deliberated and decided by a vote of 5 to 2 that your conduct constituted a professionalism violation. By separate vote, the Committee decided by a vote of 5 to 2 to dismiss you from the Medical School.
>
> Although the Committee voted that your conduct constituted a professionalism violation, the Committee's decision to dismiss you was not a disciplinary sanction. The dismissal was a decision based on your inability to demonstrate competencies expected and required of a physician. The Committee considers your dismissal an academic dismissal.

5

(*Id.* at 96.)

In addition, the COSSS informed Mulla of his right to appeal within 10 calendar days, based on new information not reasonably available to the committee prior to making its decision. (*Id.*) Also, if Mulla believed that there had been a violation of a University rule, policy, or established practice, or if he believed there had been discrimination in the University-student relationship, the COSSS advised him that he could file a student academic complaint, providing a link about that procedure. (*Id.*)

Before receiving the decision letter from the COSSS, Mulla filed a direct appeal letter with the University's Provost on August 16, 2020, requesting that all disciplinary proceedings be stayed, pending her decision. (Pl.'s Ex. 16 [Doc. No. 17-1 at 98–99].) The University's Provost responded on August 25, 2020. (Gallia Decl., Ex. B (Provost Letter).) The Provost referenced the COSSS decision, which stated that the proper process by which to challenge the decision, when final, was through an academic complaint, and not through a direct appeal to the Provost. (*Id.*) Regarding Mulla's request for a stay, the Provost provided the following information from the Administrative Policy: *Addressing Student Academic Complaints*:

> If your college or program has an appeal process for dismissals, you must follow that process before filing a student academic complaint. Your enrollment continues while the appeal is pending. If your appeal is denied, your enrollment ends and you may file a student academic complaint at that point. If your academic complaint is successful, you then would be reinstated as a student.

(*Id.*) Finally, the Provost reiterated that Mulla had the right to appeal based on new information. (*Id.*)

As noted, in April 2020, Mulla filed the Complaint in this matter, alleging violations of his due process rights and asserting several state law claims. In the instant motion, Mulla requests that the University be enjoined from dismissing him from the Medical School and instead allow him to continue his academic progression while this action proceeds. (Pl.'s Mem. at 4.) Mulla argues that he meets the elements necessary for the issuance of injunctive relief, asserting that (1) he is likely to succeed on the merits of his due process claim; and (2) he will suffer irreparable harm absent injunctive relief, citing the loss of access to the learning environment and an academic disruption that will affect his academic performance, graduation date, and physical well-being. (*Id.* at 4–5.)

In opposition, the University argues that this matter is not amenable to injunctive relief, as the preservation of the status quo would simply return Mulla to academic suspension, which dates back to November 2019. (Def.'s Opp'n [Doc. No. 25] at 6–7.) The University maintains that Mulla cannot establish any of the required elements necessary for obtaining a preliminary injunction. (*Id.* at 8–15.)

## II. DISCUSSION

### A. Legal Standard for Injunctive Relief

A "preliminary injunction is an extraordinary remedy," and the "party seeking injunctive relief bears the burden of proving" that the relevant factors "weigh in its favor." *MPAY Inc. v. Erie Custom Computer Applications, Inc.*, __ F.3d __, 2020 WL 4726523, at *2 (8th Cir. Aug. 14, 2020) (quoting *Mgmt. Registry, Inc. v. A.W. Cos.*, 920 F.3d 1181, 1183 (8th Cir. 2019)). This Court considers the following four factors to determine whether a preliminary injunction is warranted: (1) the movant's likelihood of success on

the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm injunctive relief would cause to the other litigants; and (4) the public interest. *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc); *accord Watkins, Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003) (quoting *Dataphase*). Although no single factor is determinative, "the probability of success factor is the most significant." *MPAY Inc.*, 2020 WL 4726523, at *2 (citing *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013)).

To analyze these factors, the Court must "flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires the court to intervene." *Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 601 (8th Cir. 1999). The burden of establishing the four *Dataphase* factors lies with the party seeking injunctive relief. *Watkins*, 346 F.3d at 844.

### 1. Likelihood of Success on the Merits

As noted, a party seeking injunctive relief must demonstrate a "fair chance of prevailing" on the merits of his claims. *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008) (en banc). This factor does not require the moving party to "prove a greater than fifty percent likelihood" of prevailing, however. *PCTV Gold, Inc. v. SpeedNet, LLC*, 508 F.3d 1137, 1143 (8th Cir. 2007) (quoting *Dataphase Sys.*, 640 F.2d at 113).

Although Mulla asserts several claims in his Amended Complaint, his § 1983 due process claims form the basis for his motion for injunctive relief. (*See* Pl.'s Mem. at 4–5) (stating that the COSSS "pre-emptively [made] biased conclusion[s] prior to due process

8

procedures," that provisions for Mulla's 2019 reinstatement "stripped [his] procedural due process rights" and that "due process violations that damage a student's academic progression have a lifelong impact.")  Accordingly, the Court confines its analysis to the likelihood of success of Plaintiff's due process claims.

The Due Process Clause prohibits the deprivation of "life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  The clause has two components:  procedural due process and substantive due process.  *Singleton v. Cecil*, 176 F.3d 419, 424 (8th Cir. 1999).  "Analysis of either a procedural or substantive due process claim must begin with an examination of the interest allegedly violated, and the possession of a protected life, liberty, or property interest is a condition precedent to any due process claim. Where no such interest exists, there can be no due process violation." *Id.* (quotations and citations omitted); *accord Senty–Haugen v. Goodno*, 462 F.3d 876, 886 (8th Cir. 2006) ("A procedural due process claim is reviewed in two steps. The first is whether [the plaintiff] has been deprived of a protected liberty or property interest.").

In the Amended Complaint, Mulla asserts violations of both substantive and procedural due process.  (Am. Compl. ¶¶ 72, 75–76, 81–82, 86.)  His claims are based on the deprivation of a property right to attend a public school and a liberty interest in his good name and reputation.  (*Id.* ¶¶ 75–76; 81–82.)  Our sister court in *Doe v. University of Nebraska*, __ F. Supp. 3d __, 2020 WL 1666180, at *34 (D. Neb. Apr. 3, 2020), recently observed that "[n]either the Supreme Court nor the Eighth Circuit has clearly established that continued enrollment in a post-secondary education program is a property or liberty interest protected by the Fourteenth Amendment's guarantee of substantive due process,"

although a state may create such a liberty interest. As to one's good name and reputation, the Eighth Circuit has recognized that the Due Process Clause protects such a liberty interest. *Kyles v. E. Neb. Human Servs. Agency*, 632 F.2d 57, 61 (8th Cir. 1980) (citations omitted). For purposes of this limited analysis of the merits of Mulla's due process claims, the Court will thus assume without deciding the existence of a protected property or liberty interest. *See Monroe v. Ark. State Univ.*, 495 F.3d 591, 594–95 (8th Cir. 2007) (assuming without deciding that the plaintiff's interest in pursuing his education constituted a constitutionally protected interest) (citing *Bd. of Curators of the Univ. of Mo. v. Horowitz*, 435 U.S. 78, 84–85 (1978) (same)).

### a. Substantive Due Process

"The theory of substantive due process is properly reserved for truly egregious and extraordinary cases." *Mills v. City of Grand Forks*, 614 F.3d 495, 498 (8th Cir. 2010) (quotation omitted). "Such a high standard is necessary 'lest the Constitution be demoted . . . to a font of tort law.' " *Der v. Connolly*, 825 F.Supp.2d 991, 998 (D. Minn. 2010) (alteration in original) (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n. 8 (1998)). "A plaintiff must establish the government action complained of is truly irrational, that is something more than arbitrary, capricious, or in violation of state law. Truly irrational conduct is conscience shocking in a constitutional sense." *Mills*, 614 F.3d at 498 (quotations and citation omitted). "Because the conscience-shocking standard is intended to limit substantive due process liability, it is an issue of law for the judge, not a question of fact for the jury." *Sitzes v. City of West Memphis Ark.*, 606 F.3d 461, 467 (8th Cir. 2010) (quotation omitted).

Mulla appears to cite two purported substantive due process violations. However, at this time, the alleged conduct does not rise to the conscious-shocking level necessary to succeed as a substantive due process violation. Plaintiff's suggestion that Dr. Kim solicited negative feedback from medical students specifically about Mulla (Pl.'s Mem. at 1) is belied by the record. In a December 9, 2019 email to the University's medical students, Dr. Kim acknowledged that he had received reports from several Twin Cities Medical School students who had received anonymous text messages either warning of or accusing individuals of inappropriate behavior. (Pl.'s Ex. 3 [Doc. No. 17-1 at 49].) Dr. Kim noted that such conduct could be considered harassment, or if coming from a medical student, a violation of professionalism, and asked students to report any such communications. (*Id.*) The email did not identify Mulla by name, and Dr. Kim's conduct in sending it was not conscious-shocking, nor was it arbitrary or capricious.

Plaintiff also alleges that Ms. Weston, a member of the COSSS and an EOAA complainant about Mulla's conduct, "prejudiced her fellow COSSS colleagues against him," "poisoned and shaped the perspectives of the students she encountered," and "conspire[ed] to remove Mr. Mulla from the [Medical School] because she was disappointed that Mr. Mulla [had returned to the Medical School]." (Pl.'s Mem. at 3, 12.) Among other things, Mulla alleges that she authored an "anonymous" letter and testified to hearsay statements. (*Id.* at 12–13.) These allegations are unlikely to support a successful substantive due process claim. Ms. Weston recused herself from the committee's decisions on dismissal and professionalism, as Mulla acknowledges. (Am. Compl. ¶ 38.)

Furthermore, his allegations regarding her conduct and motivation are rife with speculation.

In sum, based on the current record, the Court finds that Plaintiff is unlikely to succeed in proving that the conduct of the University Defendants was irrational, unreasonable, or arbitrary and capricious.

### b.  Procedural Due Process

Mulla's allegations of procedural due process violations also appear unlikely to succeed.  A procedural due process claim requires a two-step analysis.  *Krentz v. Robertson*, 228 F.3d 897, 902 (8th Cir. 2000).  After demonstrating that the state deprived Mulla of a protected interest—which, again, the Court assumes without deciding here—he "must establish that the state deprived him of that interest without sufficient 'process.'"  *Id.*

The nature of an educational dismissal bears on the type of process that is due.  In *Horowitz*, the Supreme Court stated that dismissals for academic deficiencies require less due process than dismissals for disciplinary reasons.  435 U.S. at 86, 89–90.  The Court noted the "significant difference between the failure of a student to meet academic standards and the violation by a student of valid rules of conduct," finding that the difference "calls for far less stringent procedural requirements in the case of an academic dismissal."  *Id.* at 86.  Relying on *Horowitz*, the Eighth Circuit requires notice and a "careful and deliberate" standard for academic dismissals.  *Monroe*, 495 F.3d at 595.

Here, the COSSS stated that Mulla's dismissal was for academic reasons.  (Pl.'s Ex. 15 [Doc. No. 17-1 at 96]) ("The Committee considers your dismissal an academic dismissal.")  Mulla contends that the COSSS merely labeled his dismissal as academic, but

12

it was actually disciplinary. (Pl.'s Mem. at 7.) The Supreme Court has observed that a "variety of factors" may relate to a student's academic proficiency and bear on "a school's determination of whether a student will make a good medical doctor." *Horowitz*, 435 U.S. at 91 n.6. Thus, courts have found some dismissals to be "academic" in nature "when the student's deficiencies, while arguably warranting disciplinary action, also bear on academic performance." *Monroe*, 495 F.3d at 595 (citing *Horowitz*, 435 U.S. at 91 n.6) (personal hygiene and timeliness affecting academic aptitude of medical student); *Richmond v. Fowlkes*, 228 F.3d 854, 858 (8th Cir. 2000) (inappropriate behavior in class, tardiness, and inappropriate interaction with instructors contributing to academic deficiencies). In any event, while a formal hearing was not required for an academic dismissal, *see Horowitz*, 435 U.S. at 89–90, Mulla received a formal hearing, at which he was free to contest any of the findings from the EOAA and present his own evidence and testimony, which he did. Moreover, the COSSS advised Mulla of his right to appeal its decision and the means by which to do so. (Pl.'s Ex. 15 [Doc. No. 17-1 at 96].) Mulla cites no authority supporting his position that, under these facts, a procedural due process violation has occurred, warranting this Court's intervention.

In support of Mulla's procedural due process claim, he refers to various aspects of the EOAA investigation and COSSS hearing, including an "anonymous letter" that was presented to the COSSS two days prior to the hearing. (Pl.'s Mem. at 5–6.) The letter was signed by the "University of Minnesota Medical School – Alumni Class of 2020." (Pl.'s Ex. 11 [Doc. No. 17-1 at 79–80].) Plaintiff contends that he was denied due process because the signatories to the letter were redacted, and the letter was not provided to the

13

EOAA (Pl.'s Mem. at 5–6.) However, as a factual matter, this letter is unlikely to support a violation of procedural due process, as the COSSS declined to base its decision on the information contained in the letter. (Pl.'s Ex. 15 [Doc. No. 17-1 at 96].) As the COSSS explained, "their decisions at the hearing were not based on concerns raised in the Alumni Letter, but rather the live testimony at the hearing and the other written materials, particularly those relating to [Mulla's] 2019 conduct and current professionalism." (*Id.*)

Mulla further argues that the witnesses and presenter before the COSSS "grasped for 'professionalism concerns' from unsubstantiated and clearly disproven allegations found in the EOAA report." (Pl.'s Mem. at 6–7.) He also contends that the COSSS failed to clearly outline its professionalism concerns. (*Id.* at 7.) By Mulla's own admission, however, the EOAA conducted a "detailed and lengthy investigation." (*Id.* at 2.) Indeed, the EOAAA agreed that Mulla's actions did not rise to the level of sexual harassment or conduct of a sexual nature. (Pl.'s Ex. 2 [Doc. No. 17-1 at 43–47].) However, the EOAA also made factual findings about Mulla's conduct that, while not rising to the level of sexual harassment, flagged professionalism concerns among the COSSS members. Specifically, the EOAA found that Mulla engaged in frequent "unwelcome interactions" with several medical students and sent "unwelcome social media messages" to five medical school students. (*Id.* at 36–47.) Although Mulla may disagree with the EOAA's characterization of these interactions, that does not render the EOAA's factual findings "false" or "disproven."

The COSSS was not precluded from considering all of the information in the EOAA report. Mulla was given an opportunity to respond, and did respond, to the allegations

14

against him. Moreover, he was warned in connection with his 2019 reinstatement that "any further professionalism concern" would result in his immediate suspension and dismissal hearing. (Pl.'s Ex. 1 [Doc. No. 17-1 at 3].) And the University confirmed, in the fall of 2019, that his suspension was, in fact, due to professionalism concerns. (Pl.'s Ex. 5 [Doc. No. 17-1 at 53].)

Somewhat relatedly, Mulla argues that the COSSS relied on "an ex post facto policy to demonstrate graduation requirements which did not previously exist" regarding professionalism. (Pl.'s Mem. at 9.) However, the Medical School's competency requirements were approved in July 2019, and therefore, were in place prior to Mulla's reinstatement as a medical student in the fall of 2019. Univ. of Minn. Medical School, *Competencies Required for Graduation* (July 2019) https://med.umn.edu/md-students/academics/competencies-required-graduation. Accordingly, it appears that Mulla's procedural due process claim based on his "ex post facto" argument is unlikely to succeed.

The Court likewise finds Mulla's allegation that counsel for the University informed him that his "probationary status precluded him from procedural and substantive due process" (Pl.'s Mem. at 7), is unlikely to successfully support a procedural due process claim. The record reflects that counsel for the University informed him that the "University is committed to ensuring that Mr. Mulla's due process rights are protected." (Gallia Decl., Ex. C (Jan. 20, 2020 Letter) at 1.) In any event, regardless of the statements from the University's counsel, Mulla was advised of the allegations against him, had a full hearing, with the opportunity to testify and present evidence, and was advised of his rights to appeal.

15

While Mulla also contends that his counsel was "cut off" during cross examination of witnesses at the hearing, in an analogous employment setting, the Eighth Circuit has held that when the complainant is not afforded the opportunity to examine or cross examine witnesses in an administrative action, there is no due process violation. *Raymond v. Bd. of Regents of the Univ. of Minn.*, 847 F.3d 585, 590–91 (8th Cir. 2017) (stating, "This type of process is not required prior to termination") (citing *Mathews v. Eldridge*, 424 U.S. 319, 343 (1976) (noting that "something less than an evidentiary hearing is sufficient prior to adverse administrative action.").

Mulla also alleges that counsel for the University assured him that "if the EOAA report establishes there are no policy violations, Mr. Mulla would be allowed to re-enroll in classes." (Pl.'s Mem. at 7.)  This statement is unlikely to provide the basis for a successful procedural due process claim.  While counsel for the University made such a statement in a November 18, 2019 letter, (Pl.'s Ex. 7 [Doc. No. 17-1 at 58]), counsel could not predict the decision of the COSSS.  Moreover, in January 2020, counsel for the University also advised Mulla that he would be afforded due process rights if he was charged with a violation that was *not* considered sexual harassment, sexual assault, stalking or relationship violence, (Gallia Decl., Ex. C (Jan 8, 2020 Letter) at 1), suggesting that other findings could support other consequences. And again, when the University reinstated Mulla as a student in the fall of 2019, it notified him that any professionalism concerns would result in his immediate dismissal and a hearing.  (Pl.'s Ex. 1 [Doc. No. 17-1 at 3].)

16

In short, the Court finds that based on the current record, Mulla is unlikely to prevail on the merits of his procedural due process claim. He cites no authority supporting his position that, under these facts, a procedural due process violation has occurred, warranting this Court's intervention.

### 2. Irreparable Harm

The Court now turns to the second factor for injunctive relief—whether Mulla will be irreparably harmed absent a preliminary injunction. *Dataphase Sys.*, 640 F.2d at 114. "Failure to show irreparable harm is an independently sufficient ground upon which to deny a [stay]." *Rogers Grp., Inc. v. City of Fayetteville*, 629 F.3d 784, 789 (8th Cir. 2010).

Mulla argues that he will be irreparably harmed, absent a preliminary injunction. He asserts that unless he is "readmitted immediately, a delay in enrollment would create an academic disruption at the start of a new semester and would have drastic implications on Mr. Mulla's academic performance, graduation date, and physical well-being." (Pl.'s Mem. at 5.) He contends damages alone cannot compensate for the loss of access to the school learning environment. (*Id.*)

Mulla does not assert that absent a preliminary injunction, he is precluded from pursuing his education—instead, he wants to be readmitted to the Medical School at the start of the fall semester. But "a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 425 (8th Cir. 1996). The Court does not minimize the harm caused by a delay in the completion of a degree, but the harm alleged here is too speculative for the Court to find that it is irreparable.

17

Moreover, Courts have held that where there is an adequate legal remedy, a party does not suffer irreparable harm. *Sampson v. Murray*, 415 U.S. 61, 88 (1974); *Watkins*, 346 F.3d at 844. A review process exists. Mulla may appeal to the COSSS upon the basis of new information and thereafter, in an academic complaint, and finally, through petitioning for a writ of certiorari with the Minnesota Court of Appeals. (Gallia Decl., Ex. A (July 30, 2016 Univ. of Minn. Policies & Procedures of the COSSS)); *Shaw v. Bd. of Regents of Univ. of Minn.*, 594 N.W.2d 187, 191 (Minn. Ct. App. 1999). Mulla has not pursued an administrative appeal prior to seeking the extraordinary remedy of injunctive relief, in which he asks this Court to overturn an academic dismissal decision.

Accordingly, for the foregoing reasons, the Court finds that Mulla has not shown the existence of irreparable harm requiring a clear and present need for relief.

### 3. Remaining *Dataphase* Factors

Regarding the balance of harms, Mulla argues that the harm to him, absent an injunction, is great because he will not be able to progress academically. (Pl.'s Mem. at 5.) By contrast, he argues, the harm to the University if an injunction is issued, is "essentially nonexistent" because the fall semester will be conducted primarily remotely. (*Id.*) The University, on the other hand, argues that the issuance of a preliminary injunction would undermine "the professional judgment and integrity of the Medical School, which concluded that Mulla lacks the competencies required to be a physician." (Def.'s Opp'n at 15.) The Court finds that consideration of the balance of harms weighs in the University's favor. Regardless of the mode of instruction this fall, the issuance of a preliminary injunction would undermine the Medical School's professional judgment and integrity,

particularly since Mulla has not sought final resolution of his case through the University's administrative process.

Finally, as to the public interest, the Court finds that it also weighs in the University's favor. "The Supreme Court has articulated that it is generally not in the public interest for courts to second-guess the academic decisions of a college or university." *Gomez v. Allbee*, 134 F. Supp. 3d 1159, 1182 (S.D. Iowa 2015) (citing *Widmar v. Vincent*, 454 U.S. 263, 276 (1981)). A university is in the best position to determine whether a student meets its academic qualifications. Particularly where a student has been subject to a full investigation and hearing, and has an avenue for appeal, the Court finds it is in the public interest to give deference to the University's decision-making process.

Accordingly, for all of the foregoing reasons, on balance, the Court finds that Plaintiff has not met the *Dataphase* factors necessary for the extraordinary remedy of injunctive relief.

### III.  ORDER

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiff's Motion for a Preliminary Injunction [Doc. No. 15] is **DENIED**.

Dated:  September 3, 2020          s/Susan Richard Nelson
                                   SUSAN RICHARD NELSON
                                   United States District Judge