## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Mehdijaffer Allyakber Mulla, | Case No. 20-cv-931 (SRN/LIB) |
| Plaintiff, | |
| v. | **ORDER ON MOTION TO DISMISS** |
| The University of Minnesota, the Regents of the University of Minnesota, Michael Kim, and Julia Weston, | |
| Defendants. | |

James Robbins, Kowitz Law, P.O. Box 598, Lindstrom, MN 55045, for Plaintiff

Carrie Ryan Gallia, University of Minnesota, Office of the General Counsel, 360 McNamara Alumni Center, 200 Oak Street SE, Minneapolis, MN 55455, for Defendants the University of Minnesota, the Regents of the University of Minnesota, and Michael Kim

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on the Motion to Dismiss [Doc. No. 31] filed by Defendants the University of Minnesota, the Regents of the University of Minnesota, and Michael Kim (collectively, the "University Defendants"). The parties appeared for a hearing by teleconference on November 19, 2020 before the undersigned judge.  For the reasons set forth below, the Court grants the University Defendants' motion.

## I.      BACKGROUND

In August 2020, Plaintiff filed his Amended Complaint against the University Defendants and Julia Weston.  (Am. Complaint [Doc. No. 23-2].)  Mulla alleges the following 14 claims:  (1) constitutional violations of due process and Title IX under 42

U.S.C. § 1983 (Counts 2, 3, & 4); (2) violation of Title IX (Count 1); (3) defamation (Counts 6 & 7); (4) breach of contract (Count 9); (5) intentional infliction of emotional distress (Counts 11 & 12); (6) negligent infliction of emotional distress (Count 13); (7) negligence (Counts 5 & 8); (8) First Amendment retaliation (Count 10); and (9) estoppel and reliance (Count 14). The Amended Complaint also cites a number of exhibits that Plaintiff filed at Docket Number 22, to which he frequently refers in the Amended Complaint by Bates number.[1] (*See, e.g., id.* ¶¶ 19, 21, 30.)

## A. Factual Background

Mulla, a Minnesota resident, has attended the University of Minnesota's Medical School ("the Medical School") in the past. (*Id.* ¶¶ 9, 44.) The University of Minnesota's Board of Regents is the University's governing board, (*id.* ¶ 10), Michael Kim is the Medical School's Assistant Dean for Student Affairs, (*id.* ¶ 12), and Julia Weston is the Student Representative on the Medical School's Committee on Student Scholastic Standing ("COSSS").[2] (*Id.* ¶ 13.) Although the Board of Regents is a named Defendant, none of Mulla's causes of action are asserted against it.

---

[1]    Plaintiff separately filed many of the same exhibits in opposition to the Motion to Dismiss. (*See* Pl.'s Exs. [Doc. No. 40].) These later-filed exhibits appear to bear the same Bates numbers as the documents he cites in the Amended Complaint, although the later-filed exhibits include more documents. (*Compare* Doc. No. 22 *with* Doc. No. 40). Because the Court focuses on the allegations in the Amended Complaint and the documents embraced by the pleadings, the Court's citations to Plaintiff's exhibits are all found at Docket Number 22.

[2]    Plaintiff only recently sought to effect service of process of the Amended Complaint on Ms. Weston, at the Court's direction. (*See* Feb. 1, 2021 Order [Doc. No. 45]) (requiring proof of service of process within 20 days or demonstrated good cause for an extension of time to serve Ms. Weston). The docket reflects that Mulla filed Ms. Weston's February 8,

The Medical School's COSSS is tasked with the following responsibilities:  (1) monitoring the progress of medical students, particularly when students "fail[] to meet the academic, technical, or professional standards for progression and graduation"; (2) evaluating students' performance and adherence to the University of Minnesota's academic and professional policies; and (3) evaluating whether students have met the requirements for an MD degree.  (Pl.'s Ex. R at 110–11; *see also* Pl.'s Ex. V at 133.)  Medical students must demonstrate proficiency in nine areas of competency in order to graduate:  (1) patient care; (2) knowledge for practice; (3) practice-based learning and improvement; (4) interpersonal and communication skills; (5) professionalism; (6) systems-based practice; (7) interprofessional collaboration; (8) personal and professional development; and (9) scientific and clinical inquiry.  Univ. of Minn. Medical School, *Competencies Required for Graduation* (July 2019) https://med.umn.edu/md-students/academics/competencies-required-graduation.  When a student fails to meet previously established consequences regarding certain standards or requirements, the COSSS has several options, or "outcomes."  (Pl.'s Ex. R at 114–15.)  These outcomes include, but are not limited to, the following:  verbal or written warnings, remediation programs, participation in programs outside of the medical school, placement on a leave of absence, suspension from the Medical School, and dismissal from the Medical School.  (*Id.*; *see also* Pl.'s Ex. V at 138–39.)

---

2021 waiver of service on February 10, 2021 [Doc. No. 47].  Ms. Weston does not join in the University Defendants' Motion to Dismiss, which was filed several months before Mulla served her with the Amended Complaint.

Mulla entered the Medical School in the fall of 2016.  (*See* Pl.'s N at 86; Pl.'s Ex. W at 145].)   In 2017, the COSSS suspended Mulla from the Medical School for violating certain policies, after the University's Office for Equal Opportunity and Affirmative Action ("EOAA") had conducted an investigation.  (Am. Compl. ¶ 17.)

In July 2019, Mulla appeared before the COSSS to request reinstatement.  (*Id.*) Finding that he had demonstrated rehabilitation, the COSSS readmitted Mulla to the Medical School on several conditions, including that "any further professionalism concern will result in your immediate suspension and dismissal hearing." (*Id.* ¶ 18.) Mulla resumed his studies at the Medical School in the fall of 2019.  (*Id.* ¶ 19.)

In November 2019, Medical School students reported new allegations about Mulla to the Medical School's Assistant Dean for Student Affairs, Dr. Michael Kim.  (*Id.* ¶¶ 19– 20.) The complainants described conduct that could possibly constitute sexual harassment. (Pl.'s Ex. D at 12) (stating, in the background section of the EOAA report, that Dr. Kim had filed a report with the EOAA "stating that seven female medical students contacted him to report they were experiencing harassment from [Mulla].").  Mulla alleges that these allegations were "false," and that subsequently, Dr. Kim solicited additional complaints from the student body via email.  (Am. Compl. ¶¶ 19–20*.*)

On November 14, 2019, Dr. Kim informed Mulla via email that the Medical School had received reports from "multiple students" who raised concerns that "[Mulla] ha[d] exhibited unprofessional behavior." (Pl.'s Ex. D at 51.)  Dr. Kim stated that these new professionalism concerns prompted the Medical School to suspend Mulla, in accordance with the provisions of his fall 2019 reinstatement which warned that any further

professionalism concerns would result in immediate suspension and a dismissal hearing. (*Id.*; Am. Compl. ⁋ 21.)  Mulla alleges that Dr. Kim suspended him "without providing Mr. Mulla the allegations or the ability to respond."  (Am. Compl. ⁋ 21.)

Separate from Mulla's immediate suspension based on professionalism concerns, Dr. Kim referred the reports of alleged sexual harassment to the University's EOAA Office on November 20, 2019.  (Pl.'s Ex. D at 12.)

In November and December 2019, Kaley Klanica, Senior Associate General Counsel for the University, responded to inquiries from Mulla's counsel, reiterating the reason for Mulla's suspension, and distinguishing it from any disciplinary action that might result from the EOAA investigation :

> Mr. Mulla's suspension was triggered by the conditions imposed by the Committee on Student Scholastic Standing (COSSS). The members of COSSS voted to reinstate Mr. Mulla on probation, conditioned on his immediate suspension upon "any further professionalism concern."  The suspension is triggered by a "concern," not a confirmed violation of a policy. Violations of the policy need to be supported by a preponderance of the evidence. It is my understanding that one or more reports have been made to the University's Office of Equal Opportunity and Affirmative Action (EOAA), and EOAA will conduct any warranted investigation pursuant to Title IX and University policy.

(Pl.'s Ex. G at 58; *see also* Pl.'s Ex. E at 53; Am. Compl. ⁋⁋ 34–35.)

The EOAA conducted an investigation under Title IX into the students' allegations, which included "reports of sexual misconduct," to determine if the conduct constituted a violation of the University's Student Conduct Code regarding sexual harassment.  (Am. Compl. ⁋ 22.)  Mulla alleges that the EOAA failed to advise him of the allegations, delayed

interviewing critical witnesses, and violated its own guidelines without allowing a response to any allegation.  (*Id.* ¶ 23.)

Nonetheless, Mulla also alleges that "[t]he EOAA conducted a detailed and lengthy investigation that lasted over 200 days," culminating in a 44-page report, issued in June 2020.  (*Id.* ¶ 36; Pl.'s Ex. B at 6–47.)  During the EOAA's Title IX investigation, it interviewed a number of complainants, witnesses, and Mulla.  (Pl.'s Ex. B at 14.)  Among the written materials that the EOAA reviewed were statements provided by Mulla and others, and social media and email messages from Mulla.  (*Id.* at 14–15.)  The EOAA found insufficient evidence to establish that Mulla had engaged in sexual or gender-based harassment, or had created a hostile environment, in violation of the University's Student Conduct Code.  (*Id.* at 43–47.)  Accordingly, Mulla received no discipline as a result of the Title IX investigatory proceeding.  However, the EOAA found, as a factual matter, that Mulla "sent unwelcome social media messages to five Complainants in September, October, and November 2019" and that he had numerous unwelcome in-person interactions with classmates.  (*Id.* at 36–45.)

In July 2020, in a separate academic proceeding before the Medical School's COSSS, the committee held a hearing to determine whether Mulla's conduct—while not subject to discipline for violations of the University's Student Conduct Code, but deemed "unwelcome"—warranted any sanctions for professionalism reasons.  (Pl.'s Ex. O at 91].)  Again, the COSSS had readmitted Mulla to the Medical School in the fall of 2019 on the condition that "any further professionalism concern" would result in his immediate suspension and a dismissal hearing.  (Am. Compl. ¶ 18.)  At the July 23, 2020 hearing,

6

conducted via Zoom, Mulla provided a personal statement to the COSSS, and witnesses provided testimony.  (*Id.* ¶ 42.)  The hearing, scheduled for one hour, extended past the allotted time.  (*Id.*  ¶ 43.)  Mulla was represented by counsel at the hearing, although he alleges that his counsel was "cut off" by the COSSS chair during cross examination of witnesses.  (*Id.*)

On August 18, 2020, the COSSS issued a seven-page academic decision letter to Mulla, which recounted the hearing process and procedures and explained its decision. (Pl.'s Ex. O at 91–97.)  It noted that Mulla had received written notice of the hearing, and was represented by counsel.  (*Id.* at 91.)  It further observed that the hearing was recorded, counsel gave opening statements, Mulla read from a prepared statement and answered questions from the committee, written materials were submitted, and two Medical School students testified as witnesses regarding their concerns about Mulla's conduct.  (*Id.* at 92– 94.)   The COSSS concluded that Mulla's conduct was deficient with regard to professionalism, a competency requirement for graduation.  (*Id.* at 95.)  It stated:

> The committee carefully deliberated and decided by a vote of 5 to 2 that your conduct constituted a professionalism violation.  By separate vote, the Committee decided by a vote of 5 to 2 to dismiss you from the Medical School.
>
> Although the Committee voted that your conduct constituted a professionalism violation, the Committee's decision to dismiss you was not a disciplinary sanction.  The dismissal was a decision based on your inability to demonstrate competencies expected and required of a physician.  The Committee considers your dismissal an academic dismissal.

(*Id.* at 96.)

In addition, the COSSS informed Mulla of his right to appeal within 10 calendar days, based on new information not reasonably available to the committee prior to making its decision. (*Id.*) Also, if Mulla believed that there had been a violation of a University rule, policy, or established practice, or if he believed there had been discrimination in the University-student relationship, the COSSS advised him that he could file a student academic complaint, and provided a link about that procedure. (*Id.*)

Before receiving the decision letter from the COSSS, Mulla filed a direct appeal letter with the University's Provost on August 16, 2020, requesting that all disciplinary proceedings be stayed, pending the Provost's decision. (Pl.'s Ex. P at 98–99.) The Provost responded on August 25, 2020. (Pl.'s Ex. X at 22.) The Provost referenced the COSSS decision, which stated that the proper process by which to challenge the decision, when final, was through an academic complaint, and not through a direct appeal to the Provost. (*Id.*) Regarding Mulla's request for a stay, the Provost provided the following information from the Administrative Policy: *Addressing Student Academic Complaints*:

> If your college or program has an appeal process for dismissals, you must follow that process before filing a student academic complaint. Your enrollment continues while the appeal is pending. If your appeal is denied, your enrollment ends and you may file a student academic complaint at that point. If your academic complaint is successful, you then would be reinstated as a student.

(*Id.*) Finally, the Provost reiterated that Mulla had the right to appeal based on new information. (*Id.*)

8

## B. Procedural History

In April 2020, Mulla filed the Complaint in this matter [Doc. No. 1], alleging violations of Title IX and his due process rights, and asserting several state law claims against the University, the Board of Regents, and Dr. Kim. In August 2020, the University Defendants filed an initial motion to dismiss [Doc. No. 10]. Shortly thereafter, Mulla filed a motion for a preliminary injunction [Doc. No. 15], requesting that the University be enjoined from dismissing him from the Medical School and instead allow him to continue his academic progression while this action proceeded. The Court found that Mulla failed to meet the elements necessary for the issuance of injunctive relief, including the finding that his due process claims were unlikely to succeed on the merits. (Sept. 3, 2020 Order [Doc. No. 30] at 8–17.) Accordingly, the Court denied Mulla's motion for injunctive relief. (*Id.* at 19.)

Also in August 2020, Mulla filed the Amended Complaint in which he asserted additional legal claims and added Julia Weston as a defendant. In light of the filing of the Amended Complaint, the University Defendants withdrew their then-pending motion to dismiss, finding that it was rendered moot by the filing of the Amended Complaint. (Notice of Withdrawal [Doc. No. 29].) Shortly thereafter, the University Defendants filed the instant motion to dismiss based on Mulla's allegations in the Amended Complaint.

## C. Parties' Positions

In their Motion to Dismiss, the University Defendants argue that the Amended Complaint should be dismissed in its entirety for Mulla's failure to state a claim under

Federal Rule of Civil Procedure 12(b)(6) and on the basis of sovereign immunity.  (Univ. Defs.' Mem. [Doc. No. 34] at 1–2.)

Specifically, the University argues that it is not a "person" subject to liability under § 1983, sovereign immunity applies to Mulla's § 1983 claims, and Mulla's freestanding Title IX and First-Amendment retaliation claims fail as a matter of law.  (*Id.* at 10–19.) The University also contends that as to Mulla's state law claims for negligence, intentional infliction of emotional distress, negligent infliction of emotional distress, breach of contract, and estoppel and reliance, it is immune from suit under the Eleventh Amendment. (*Id.* at 19–20.)

Dr. Kim argues that Mulla's § 1983 claim against him should be dismissed for several reasons, including Mulla's failure to exhaust his administrative remedies, failure to sufficiently plead the elements of a due process claim, and qualified immunity. (*Id.* at 21–27.)  As to the state-law claims against Dr. Kim for negligence, defamation, and intentional infliction of emotional distress, he asserts that:  (1) the negligence claim must be dismissed because Mulla cannot show that Dr. Kim owed him a duty of care as an official of the University, nor did he breach any duty,  (*id.* at 27–29); (2)  Mulla fails to sufficiently plead the elements of a defamation claim, and, in any event, the statements in question are qualifiedly privileged, (*id.* at 29–32); and (3) Mulla's allegations fail to meet the high bar necessary to state a claim for intentional infliction of emotional distress.  (*Id.* at 33–36.)

Finally, while the University Defendants move to dismiss Mulla's state law claims against Dr. Kim under Rule 12(b)(6), they note that the Court could alternatively decline

to exercise supplemental jurisdiction over them, if the Court finds that the federal claims that support federal jurisdiction should be dismissed.  (*Id.* at 27 n.9.)

In response, Mulla argues that the University is a "person" subject to § 1983 liability, and is not entitled to sovereign immunity because it is not an arm of the state. (Pl.'s Opp'n [Doc. No. 38] at 16–17.)  Even if it were, Mulla contends, the University has waived sovereign immunity by accepting federal funds for certain programs and activities. (*Id.* at 17–18.)  Regarding Mulla's due process claims against the University and Dr. Kim, he asserts that any requirement that he exhaust all administrative remedies would be futile in this case, his dismissal was a disciplinary matter subject to greater due process protections, and he has met his burden of establishing the essential elements of a due process claim.  (*Id.* at 20–34.)  Mulla also argues that he has sufficiently pleaded the elements of a Title IX claim and a First Amendment retaliation claim.  (*Id.* at 11–16.)

Further, Mulla contends that Dr. Kim is not entitled to qualified immunity because his actions violated Mulla's constitutional right to due process, and the right was clearly established such that Dr. Kim should have known that his conduct violated the law.  (*Id.* at 34.)  As to Mulla's negligence claims, he contends that he has sufficiently pleaded that the University Defendants owed him a duty of care, and breached that duty.  (*Id.* at 35–36.) Mulla also argues that he has sufficiently pleaded the elements of his defamation claim, and that Dr. Kim is not entitled to qualified immunity.  (*Id.* at 37–38.)  Finally, Mulla asserts that he has sufficiently pleaded his claims for intentional infliction of emotional distress.  (*Id.* at 40–41.)  For all of these reasons, Mulla asserts that the University Defendants' motion must be denied.

## II.    DISCUSSION

### A. Standard of Review

When considering a motion to dismiss under Rule 12(b)(6), the Court accepts the facts alleged in the complaint as true, and views those allegations in the light most favorable to the plaintiff.  *Hager v. Ark. Dep't of Health*, 735 F.3d 1009, 1013 (8th Cir. 2013). However, the Court need not accept as true wholly conclusory allegations or legal conclusions couched as factual allegations.  *Id*.  To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although a complaint need not contain "detailed factual allegations," it must contain facts with enough specificity "to raise a right to relief above the speculative level."  *Id*. at 555.  Where a motion to dismiss is based on an affirmative defense, such as qualified immunity, the moving party must show that it is entitled to the defense on the face of the complaint.  *Dadd v. Anoka Cty*., 827 F.3d 749, 754 (8th Cir. 2016).

When considering a motion to dismiss under Rule 12(b)(6), "the court generally must ignore materials outside the pleadings." *Porous Media Corp. v. Pall Corp*., 186 F.3d 1077, 1079 (8th Cir. 1999). Courts may, however, "consider the pleadings themselves, materials embraced by the pleadings, exhibits attached to the pleadings, and matters of public record." *Illig v. Union Elec. Co*., 652 F.3d 971, 976 (8th Cir. 2011) (citation omitted) (internal quotation marks omitted).

Here, the Court will consider the exhibits to the Amended Complaint, found at Docket Number 22, to which the pleadings refer by Bates number, or to which the

pleadings generally refer.  These exhibits were filed in conjunction with the Amended Complaint on August 25, 2020, and include, but are not limited to, the EOAA report, emails and letters between Mulla and the University, Mr. Mulla's written statement to the COSSS, the COSSS' decision letter, and the policy statement of the COSSS.  (Pl.'s Exs. [Doc. No. 22].)   In addition, because Mulla alleges that the COSSS cited academic professionalism concerns in its dismissal letter, (Am. Compl. ⁋ 44), the Court considers a Medical School document setting forth the competencies required for graduation that was in place at the time of Mulla's suspension and dismissal, Univ. of Minn. Med. Sch., *Competencies Required for Graduation* (July 2019), *supra*.  This document is a publicly available record and is embraced by the pleadings.

However, the Court declines to consider any other documents that were not filed in conjunction with the Amended Complaint.  Accordingly, the Court does not consider the Mulla Affidavit [Doc. No. 41], filed in September 2020 in opposition to the instant motion, or any additional exhibits filed by Mulla in opposition to the instant motion [Doc. No. 40] that do not duplicate the exhibits to the Amended Complaint [Doc. No. 22].

For those claims for which the University Defendants invoke sovereign immunity under the Eleventh Amendment, their motion is properly analyzed under Rule 12(b)(1).  *See United States v. Minn. Transitions Charter Sch.*, 50 F. Supp. 3d 1106, 1111 (D. Minn. 2014) (evaluating a motion to dismiss premised on Eleventh Amendment immunity under Rule 12(b)(1) because the application of Eleventh Amendment immunity would deprive the Court of jurisdiction).  Where the defendant argues that the facts alleged in the complaint fail to establish subject-matter jurisdiction—as the University Defendants'

invocation of the Eleventh Amendment asserts here—the plaintiff is afforded similar safeguards as in a Rule 12(b)(6) motion. *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990). Namely, the Court must "accept as true all factual allegations in the complaint, giving no effect to conclusory allegations of law," and determine whether the plaintiff's alleged facts "affirmatively and plausibly suggest" that jurisdiction exists. *Stalley v. Catholic Health Initiatives*, 509 F.3d 517, 521 (8th Cir. 2007). The Court's review under Rule 12(b)(1) is limited to the face of the pleadings. *Branson Label, Inc. v. City of Branson*, 793 F.3d 910, 914 (8th Cir. 2015).

## B. Federal Claims Against the University

### 1. Title IX Claim

In Mulla's freestanding Title IX claim against the University, asserted in Count 1 of the Amended Complaint, he alleges that the University violated Title IX by failing to conduct an adequate and impartial investigation into student complaints about him. (Am. Compl. ¶¶ 51–69.) He contends that the University's investigation and hearing led to an erroneous outcome and the imposition of an "unjustly severe penalty." (*Id.* ¶¶ 60, 66.)

The University argues that this claim must be dismissed for failure to state a claim, as Mulla does not offer factual allegations to support the required elements of an erroneous-outcome claim under Title IX.[3] (Univ. Defs.' Mem. at 13–16.)

---

[3] The University does not assert that this claim should be dismissed on sovereign immunity grounds, as a state educational institution that receives federal funds may not assert sovereign immunity in response to a private action to enforce Title IX. *See Franklin v. Gwinnett Cty. Pub. Sch.*, 503 U.S. 60, 72 (1992) (ruling that a damages remedy is available to enforce Title IX in part because of abrogation of sovereign immunity under

While "[f]ederal courts are not a forum for general appellate review of university disciplinary proceedings," *Doe v. Univ. of Ark.–Fayetteville*, 974 F.3d 858, 864 (8th Cir. 2020), Title IX imposes the following limitation on the authority of educational institutions that receive federal funding: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Courts have understood Title IX to prohibit universities from imposing academic discipline where sex is a "motivating factor in the decision to discipline." *Rowles v. Curators of Univ. of Mo.*, 983 F.3d 345, 359 (8th Cir. 2020) (citing *Doe v. Columbia Univ.*, 831 F.3d 46, 53 (2d Cir. 2016)). Thus, in order to state a claim in this context, Mulla must adequately allege that the University disciplined him because he is a male. *Id.* (citing *Univ. of Ark.*, 974 F.2d at 864).

Courts considering Title IX claims based on underlying disciplinary proceedings have analyzed them under the following standards: (1) erroneous outcome; (2) selective enforcement; (3) deliberate indifference; or (4) archaic assumption. *See Stenzel v. Peterson*, No. 17-cv-580 (JRT/LIB), 2017 WL 4081897, at *4 (D. Minn. Sept. 13, 2017) (citing *Doe v. Univ. of the S.*, 687 F. Supp. 2d 744, 756 (E.D. Tenn. 2009)). Because the court is unaware of authority applying an "unjustly severe penalty" standard to the review of disciplinary decisions, the Court focuses on whether Mulla sufficiently pleads an

---

the statute). For such civil rights lawsuits under Title IX, Congress has abrogated the states' Eleventh Amendment immunity. 42 U.S.C. § 2000d-7.

erroneous-outcome Title IX claim.  To allege such a claim, a plaintiff must plead:  "(1) facts sufficient to cast doubt as to the accuracy of the outcome of the disciplinary proceeding; and (2) a causal connection between the flawed outcome and gender bias." *Doe v. Univ. of St. Thomas*, 240 F. Supp. 3d 984, 990 n.1 (D. Minn. 2017) (quoting *Sahm v. Miami Univ.*, 110 F. Supp. 3d 774, 777–78 (S.D. Ohio 2015)).  In *University of Arkansas*, the Eighth Circuit found that a male plaintiff plausibly alleged a Title IX claim stemming from an underlying sexual assault investigation because he pleaded facts sufficient to show that the investigation "reached an outcome that was against the substantial weight of the evidence."  974 F.2d at 864.

### a. Facts Sufficient to Cast Doubt on the Accuracy of the Outcome of the Title IX Disciplinary Proceeding

As to whether the facts, as alleged here, cast doubt as to the accuracy of the outcome of the Title IX disciplinary proceeding, *Univ. of St. Thomas*, 240 F. Supp. 3d at 990 n.1 (citation omitted), Mulla acknowledges that with respect to the sexual harassment allegations against him, the EOAA "conducted a detailed and lengthy investigation that lasted over 200 days," resulting in a 44-page report that "exonerated Mr. Mulla."  (Am. Compl. ⁋ 36.)  Yet Mulla also alleges that "[e]ven after an investigation which presumably was lengthened to search for additional complainants and to establish a policy violation, the [University] still pursued an erroneous outcome dismissing the Plaintiff."  (*Id.* ⁋ 66.)

It is clear from the pleadings that Mulla conflates two separate proceedings:  (1) the EOAA's Title IX disciplinary investigation; and (2) the Medical School's COSSS academic proceeding.  First, with respect to the Title IX disciplinary investigation, the

EOAA found there was insufficient proof, by a preponderance of the evidence, that Mulla had engaged in conduct of a sexual nature with several female students, (Pl.'s Ex. D at 43–44), or that his conduct was sufficiently severe, persistent, or pervasive to create a hostile environment. (*Id.* at 44–47.) The investigation did not lead to a hearing. Indeed, as Mulla alleges, the outcome of the Title IX disciplinary investigation "exonerated" him from allegations that he had violated the sexual harassment policies in the University Code of Conduct. (Am. Compl. ⁋ 36.) Consequently, the Title IX proceeding resulted in no sanctions against him. The outcome of the disciplinary investigation thus *favored* Mulla. Accordingly, these facts do not "cast doubt as to the accuracy of the outcome of the disciplinary proceeding," nor does Mulla allege that the outcome of this proceeding was flawed. *Univ. of St. Thomas*, 240 F. Supp. 3d at 990 n.1 (citation omitted).

With respect to the second proceeding—the Medical School's COSSS academic proceeding—Mulla acknowledges that the COSSS decided to dismiss him, not the EOAA. (Am. Compl. ⁋ 44.) Medical School academic and professionalism concerns fall within the COSSS' purview, while sexual harassment complaints fall within the EOAA's purview under Title IX. (*Compare* Pl.'s Ex. R at 110–11 (describing role of the COSSS), *with* Am. Compl. ⁋ 3 (describing EOAA's role in investigating reports of sexual harassment policies).) It is true that here, the COSSS and the EOAA considered the same underlying conduct, for different reasons. The professionalism focus of the COSSS—based on the Medical School's required academic competencies—and the investigative and disciplinary focus of the EOAA—based on Title IX and the University's sexual harassment policy—were entirely distinct. Mulla fails to identify any authority that prohibited the COSSS from

17

evaluating the same conduct for academic professionalism concerns, even though the EOAA found, pursuant to its Title IX authority, that that conduct did not violate the University's sexual harassment policy.

In its written decision on Mulla's dismissal, the COSSS stated, "Although EOAA did not find your conduct in the Fall of 2019 to constitute a violation of the sexual misconduct policy, the EOAA review did not make any conclusions as to whether your conduct violated the professionalism standards of the Medical School." (Pl.'s Ex. O at 93.) In the fall of 2019, Mulla was well aware that the COSSS had conditioned his reinstatement to the Medical School upon the avoidance of "any further professionalism concern." (Am. Compl. ⁋ 18.)

Unlike the EOAA's focus on whether Mulla's conduct constituted sexual harassment in violation of the University's sexual harassment policy, the COSSS held a hearing and reviewed Mulla's conduct to determine whether it created concern about his fitness for the medical profession. From a professionalism standpoint, the COSSS determined that Mulla's conduct "reflect[ed] an inability to respect others' boundaries," noting his "persistence in interacting with classmates who were uncomfortable speaking with you." (Pl.'s Ex. O at 94.) Stating that "physicians must be able to read the emotions and nonverbal cues of patients and their team members," the COSSS cited five of the Medical School's Competencies Required for Graduation, including the demonstration of "insight and understanding about emotions and human responses to emotions that allow one to develop and manage interpersonal interactions." (*Id.* at 95.) Ultimately, the COSSS found that Mulla's "repetitive, unwelcome interactions did not reflect the professionalism

18

that is expected of a future physician." (*Id.*)  After deliberation, the COSSS decided by a majority vote that Mulla's conduct constituted a professionalism violation, and by a separate majority vote, decided to dismiss him from the Medical School.  (*Id.* at 96.)  In reaching this decision, the COSSS reiterated that the decision to dismiss him was not a disciplinary sanction, but was an academic dismissal, based on Mulla's "inability to demonstrate competencies expected and required of a physician."  (*Id.*)

While Mulla disagrees with the outcome of the COSSS dismissal proceeding, the erroneous-outcome standard under Title IX applies to Title IX proceedings, not the Medical School's academic dismissal proceeding here.  *See Univ. of St. Thomas*, 240 F. Supp. 3d at 990.  Mulla pleads that he was dismissed from the Medical School even though "no violation of the Defendant UMN's Sexual Misconduct Policy was found," (Am. Compl. ¶¶ 55–56), but again, the COSSS made clear that it dismissed him due to academic professionalism concerns, not pursuant to Title IX or violations of the University's sexual harassment policy.  (Pl.'s Ex. O at 96.)

Nor do Mulla's allegations cast doubt on the accuracy of the COSSS proceeding.  While he alleges that he was "severely prejudiced by the [University] limiting his ability to question witnesses" at the COSSS hearing (Am. Compl. ¶ 67), he fails to describe the additional questioning that he would have elicited, and how that would have changed the outcome of the proceeding.

Accordingly, the Court finds that Mulla fails to state the first requirement for an erroneous-outcome Title IX claim—facts sufficient to cast doubt on the accuracy of the

19

disciplinary proceeding. *Univ. of St. Thomas*, 240 F. Supp. 3d at 990 n.1 (citing *Sahm*, 110 F. Supp. 3d at 777–78).

### b. Causal Connection Between the Flawed Outcome of the Title IX Disciplinary Proceeding and Gender Bias

Nor do Mulla's Title IX allegations plausibly satisfy the causation requirements for an erroneous-outcome Title IX claim, which require him to show a causal connection between the flawed outcome and gender bias. *Id.* Again, Mulla cannot plausibly allege a "flawed outcome" from the EOAA's Title IX disciplinary investigation, because it resolved in his favor.

But even if the COSSS academic dismissal proceeding were subject to the Title IX erroneous-outcome standard, which it is not, Mulla fails to plausibly allege a connection between his dismissal and gender bias. Mulla states, in his general allegations, that in 2011, the U.S. Department of Education issued a "Dear Colleague" letter announcing that the Department expected colleges and universities to actively investigate and discipline claims of sexual misconduct using a preponderance of the evidence standard. (Am. Compl. ⁋ 24.) Mulla asserts that this policy "foster[ed] a witch-hunt mentality that unfairly predetermined the guilt of men accused of sexual misconduct and deprived them of due process and equal protection in Title IX investigations and disciplinary proceedings," and the Department ultimately withdrew the guidance in 2017. (*Id.* ⁋⁋ 25–26; Pl.'s Ex. Z at 157–58.) He further refers to a "2014 Whitepaper" published by the Association of Title IX Administrators entitled *Equity is Such a Lonely Word*, which purportedly states, "victims have historically been accorded 3/5 of the rights of an accused individual (or less), and victims are typically

women," and "equity may require institutions to recalibrate the pendulum to right the historical imbalance." (Am. Compl. ⁋ 65.) Mulla alleges, "upon information and belief," that the University was a recipient of these training materials. (*Id.*) Further, he asserts that as a public institution that receives "significant federal funding," the University "is under pressure to punish men accused of sexual misconduct in order to demonstrate its compliance with the 2011 federal mandate." (*Id.* ⁋ 26.)

Mulla also alleges that while the University provides "a plethora" of support services and resources to Title IX sexual harassment and discrimination complainants, it offers no similar services to respondents. (*Id.* ⁋ 61.) When students enter into a Title IX disciplinary matter, Mulla contends, the University thus provides a "vastly disproportionate number of support services to the complainant[s], who upon information and belief are overwhelmingly female." (*Id.* ⁋ 63.) He also alleges, "upon information and belief," that the University has "actively adopted the Title IX Coordinator's mission of increasing reporting of alleged sexual misconduct at [the University]," and "views all women who simply make complaints of alleged sexual misconduct, as 'victims.'" (*Id.* ⁋⁋ 64–65.) Mulla contends that his gender was behind the University's erroneous outcome and "unjustly severe penalty," (*id.* ⁋ 60), and notes his limited ability to question witnesses at the COSSS hearing. (*Id.* ⁋ 67.)

These allegations fail to plausibly allege a causal connection between the outcome of the proceedings here and Mulla's gender, for several reasons. First, these allegations about Title IX resources and Title IX proceedings are simply inapplicable to the COSSS academic dismissal proceeding.

21

Second, to the extent that these allegations even suggest gender bias, they are generalized, unconnected to Mulla's proceedings, conclusory, and speculative. For example, Mulla speculates, without any factual support, that the University's attitude about Title IX investigations "clearly leads to gender bias against males." (Am. Compl. ⁋ 65.) In *University of St. Thomas*, 240 F. Supp. 3d at 990–91, the Court found that conclusory allegations similar to Mulla's were insufficient to suggest that gender bias was a motivating factor behind the allegedly erroneous finding in the underlying Title IX proceedings. Among other things, the plaintiff there pleaded that the federal government pressured universities to investigate and punish male students accused of sexual assault, or risk the loss of federal education funds if they failed to do so. *Id.* The Court agrees with the holding in *University of St. Thomas* that such general references to federal "pressure," by themselves, are too conclusory to plausibly allege gender bias. *Id.* at 992 (citing *Doe v. Cummins*, 662 Fed. App'x 437, 454 (6th Cir. 2016)).

Third, to the extent that Mulla pleads more specific facts, those facts fail to suggest that gender bias motivated the outcome here. Mulla refers to the 2011 Department of Education's "Dear Colleague" guidance letter that, by his own pleading, was withdrawn by the Department in 2017. (Am. Compl. ⁋⁋ 25–26.) Therefore, such guidance was not in effect at the time of Mulla's 2019 suspension and 2020 dismissal.

In support of his claim of gender bias, Mulla relies on *University of Arkansas*, 974 F.3d at 864–65, in which the Eighth Circuit found that the plaintiff, "Doe," a male university student, sufficiently stated a claim under Title IX. (Pl.'s Opp'n at 14.) In particular, the court found that Doe's factual allegations about external pressure on the

university to hold male students responsible for sexual assault, along with other allegations, stated a facially plausible Title IX claim.  *Univ. of Ark.*, 974 F.3d at 865–66.  But the facts in *University of Arkansas* are quite distinguishable from the facts here, for many reasons. As a general matter, the Eighth Circuit found that when viewing all of Doe's allegations together, he plausibly stated a Title IX violation by alleging that:  (1) the outcome of the proceedings was against the substantial weight of the evidence; (2) the sanction did not match ordinary practice; and (3) "the University was under pressure on multiple fronts to find males responsible for sexual assault."  *Id.*  Because Mulla alleges that the 2011 "Dear Colleague" letter created "a witch-hunt mentality that unfairly predetermined the guilt of men accused of sexual misconduct," (Am. Compl. ¶ 25), the Court first addresses the Eighth Circuit's discussion of the third point, i.e., that the University of Arkansas faced external pressure to find males responsible for sexual assault.  *Univ. of Ark.*, 974 F.3d at 865.

Unlike Mulla, the plaintiff in *University of Arkansas* did not merely allege that universities were under general pressure to find males responsible for Title IX violations. (*See* Am. Compl. ¶¶ 24–26.)  Rather, Doe alleged at least five circumstances suggesting that the University of Arkansas, in particular, "was under pressure on *multiple fronts* to find males responsible for sexual assault."  *Univ. of Ark.*, 974 F.3d at 865 (emphasis added). In support of that contention, the Eighth Circuit pointed to the following specific factual allegations:  (1) the Office for Civil Rights was investigating whether the university failed to properly investigate and adjudicate Title IX complaints by females against males; (2) the Arkansas Legislature was conducting a similar investigation; (3) the university was

23

facing a "highly publicized" lawsuit brought by a female student athlete about the university's alleged mishandling of her Title IX complaint against a male student athlete; (4) these actions resulted in considerable criticism of the university in the press and on campus; and (5) the sexual assault complainant in Doe's case organized a campus-wide protest about the Title IX proceedings, resulting in significant media attention, and the issuance of a public statement by the university.  *Id.*

No such allegations support Mulla's Title IX claim.  To the extent that he asserts anything specific about University of Minnesota, Mulla alleges, in conclusory fashion, "As a public institution that receives significant federal funding, the University of Minnesota is under pressure to punish men accused of sexual misconduct in order to demonstrate its compliance with the 2011 federal mandate,"  (Am. Compl. ⁋ 26), and he alleges, "upon information and belief," that the University received certain Title IX materials concerning equity in Title IX proceedings.  (*Id.* ⁋ 65.)  But Mulla fails to identify any specific facts to support his conclusory, speculative allegations about gender bias, which is fatal to the adequacy of his pleadings.[4]  *Glick v. W. Power Sports, Inc.*, 944 F.3d 714, 717 (8th Cir.

---

[4]     The "Dear Colleague" letter contained the Department of Education's guidance regarding the standard of proof applicable to Title IX proceedings.  *Univ. of Ark.*, 974 F.3d at 868 n.1.  While Mulla alleges that the Department ultimately withdrew the "mandate" because it recognized that "through intimidation and coercion," it had "pushed schools to overreach," (Am. Compl. ⁋ 25), the Department withdrew the guidance not simply because it had been subject to criticism by legal commentators, but because it was issued without notice and comment, in violation of administrative procedure.  *Univ. of Ark.*, 974 F.3d at 868 n.1; (Pl.'s Ex. Z at 157–58).  Currently, as to the standard of proof applicable to Title IX proceedings, "[e]ffective August 14, 2020, the Department implemented a regulation under which a university must apply either a preponderance of the evidence standard or a clear and convincing evidence standard."  *Univ. of Ark.*, 974 F.3d at 868 n.1 (citing 34 C.F.R. § 106.45(b)(1)(vii)).

2019) (when analyzing a claim under Rule 12(b)(6), courts need not accept conclusory allegations as true).  Mulla fails to allege that the "Dear Colleague" letter directed universities to discipline men specifically, as opposed to alleged sexual offenders regardless of sex.  (Am. Compl. ¶ 24.)  Also missing from his allegations are any facts suggesting that the University actively endorsed policies that discussed Title IX investigations or sexual misconduct in gendered terms, or engaged in an improper pattern of decision making based on gender.  *See Univ. of St. Thomas*, 240 F. Supp. 3d at 991 n.3 (citing *Doe v. Washington & Lee Univ.*, No. 14-cv-52, 2015 WL 4647996, at *10 (W.D. Va. Aug. 5, 2015); *Wells v. Xavier Univ.*, 7 F. Supp. 3d 746, 751 (S.D. Ohio 2014)).

Moreover, the allegations in *University of Arkansas* about the university facing pressure "on multiple fronts" were not the sole basis for the Eighth Circuit's decision that Doe stated a plausible Title IX claim.  974 F.3d at 864–65.  Rather, as noted, the Eighth Circuit relied on two other specific allegations that, taken together, convinced the Court that Doe had sufficiently pleaded a plausible claim:  (1) that the Title IX panel reached an outcome that was unsupported by the substantial weight of the evidence; and (2) that its chosen sanctions against Doe were allegedly contrary to the ordinary disposition of such cases.  *Id.*

Mulla does not plausibly allege that the outcome of the proceedings here was against the weight of the evidence.  In contrast, in *University of Arkansas*, Doe alleged that the Title IX panel's findings about the incapacitation of the assault complainant, "Roe," were unexplained, and were thus found by the Eighth Circuit to be against the weight of the evidence as alleged in the complaint.  *Id*.  Here, rather than allege that the findings were

against the weight of the evidence, Mulla alleges the opposite—"the EOAA investigation exonerated Mulla of all alleged violations."  (Pl's Opp'n at 13; Am. Compl. ⁋ 36.)

The decision letter from the COSSS proceeding, again not a Title IX proceeding, is embraced by the pleadings.  In it, it is undisputed (and Mulla does not plead otherwise) that the COSSS evaluated Mulla's conduct to determine whether it raised professionalism concerns—not whether Mulla violated the sexual harassment policy in the University's Code of Conduct.  (*See* Pl.'s Ex. O at 91–96 (noting that the EOAA had cleared Mulla of sexual harassment, but had "made several findings of fact that raised professionalism concerns. . . .  These concerns were the focus of the [COSSS] hearing."); Am. Compl. ⁋ 44 ("The COSSS voted 5 to 2 that there was a professionalism violation and an ongoing professional concern and voted 5 to 2 for dismissal without establishing a violation of the Student Code of Conduct.").)  In other words, the COSSS was not "weighing the evidence" pursuant to Title IX to determine whether Mulla's conduct constituted sexual harassment, in violation of University policy.  (Pl.'s Ex. O at 91.)

In addition, in *University of Arkansas*, the court found that the Title IX panel's chosen sanction was contrary to the ordinary disposition of cases of sexual assault by force, supporting an inference that the university discriminated against Doe on the basis of sex.  974 F.3d at 865.  Here, other than Mulla's generalized allegation of an "unjustly severe penalty" (Am. Compl. ⁋ 60), he fails to allege how other similarly situated students have been treated.  And unlike the plaintiff in *University of Arkansas*, Mulla was a probationary student, on notice from the COSSS that any professionalism concerns would result in his immediate suspension and a dismissal hearing.  (*Id.* ⁋ 18.)

26

Mulla also fails to plausibly allege that his perceived inability to fully question witnesses at the COSSS hearing was motivated by sex, or that a similarly situated female student was given a greater opportunity to question witnesses. In *University of St. Thomas*, 240 F. Supp. 3d at 990–91, the male plaintiff, "Doe," made similar allegations about the underlying hearing. Among other things, Doe alleged that the university questioned medical professionals differently about Doe and Jane Doe, the complainant, and the university challenged Jane Doe's statements less vigorously than Doe's statements. *Id.* The Court found these allegations failed to plausibly allege that gender bias was a motivating factor in the university's decision, noting that numerous courts have held that "[e]ven if [a] [u]niversity treated [a] female student more favorably than the [p]laintiff, during the disciplinary process, the mere fact that [p]laintiff is male and [the alleged victim] is female does not suggest that the disparate treatment was because of [p]laintiff's sex." *Id.* at 991 (quoting *Salau v. Denton*, 139 F. Supp. 3d 989, 999 (W.D. Mo. 2015)) (alteration in original) (internal citations omitted). The same is true here.

Accordingly, for all of the foregoing reasons, the Court finds that Plaintiff's allegations are insufficient to state a claim under Title IX that is plausible on its face. Mulla's dismissal was not the result of a Title IX proceeding, and, even if it were, he fails to allege facts sufficient to cast doubt on the accuracy of the non-Title IX academic dismissal proceeding, nor does he allege facts sufficient to establish a flawed outcome or gender bias, let alone "a causal connection between the flawed outcome and gender bias." *Univ. of St. Thomas*, 240 F. Supp. 3d at 990 n.1. Nor does he plausibly allege that the

27

University Defendants reached an outcome that was not supported by the substantial weight of the evidence. *Univ. of Ark.*, 974 F.3d at 864.

Under these facts, repleading would not cure the deficiencies. *See Zutz v. Nelson*, 601 F.3d 842, 850 (8th Cir. 2010) (noting that an amendment is considered futile when it "could not withstand a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure."). Nor does Mulla offer any proposed amendments. *In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 889 (8th Cir. 2002) (stating that plaintiffs failed to explain how they would amend the pleading, and finding motion to dismiss was properly granted). Accordingly, the University Defendants' Motion to Dismiss is granted, and Mulla's Title IX claim is dismissed with prejudice.

### 2. Section 1983 Claims

In the Amended Complaint, Mulla asserts that under 42 U.S.C. § 1983, the University violated his rights under Title IX (Count 2), and under the Due Process Clause of the Fourteenth Amendment (Count 4). As to these claims, the University asserts that because it is an arm of the state, it is entitled to sovereign immunity. (Univ. Defs.' Mem. at 10–13.) Relatedly, it argues that Mulla's claim also fails as a matter of law because the University is not a "person" subject to liability under the 42 U.S.C. § 1983. (*Id.*)

### a. Eleventh Amendment Immunity

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another state, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. Courts have interpreted the Eleventh

Amendment to grant sovereign immunity to states in federal court actions brought by citizens against states. *Treleven v. Univ. of Minn.*, 73 F.3d 816, 818 (8th Cir. 1996) (citing *Hans v. La.*, 134 U.S. 1, 15 (1890)).  Sovereign immunity may be waived if a state consents to jurisdiction, *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996), or Congress expressly abrogates state immunity by statute.  *Raymond v. Bd. of Regents of Univ. of Minn.*, 140 F. Supp. 3d 807, 813 (D. Minn. 2015).

The Supreme Court has observed that the University is "an arm of the State of Minnesota," *Raygor v. Regents of Univ. of Minn.*, 534 U.S. 533, 536 (2002), and the Eighth Circuit has long found that the University is a state instrumentality.  *See Treleven*, 73 F.3d at 818 (citing *Richmond v. Bd. of Regents*, 957 F.2d 595, 598–99 (8th Cir.1992); *Schuler v. Univ. of Minn.*, 788 F.2d 510, 516 (8th Cir. 1986), *cert. denied*, 479 U.S. 1056 (1987); *Walstad v. Univ. of Minn. Hosps.*, 442 F.2d 634, 641–42 (8th Cir. 1971)).  While Mulla argues that the University has waived sovereign immunity by "accepting federal funds," (Pl.'s Opp'n at 17–18), no such general waiver applies.  Again, Congress may expressly condition a state's receipt of federal funding on the waiver of sovereign immunity, *Raymond*, 140 F. Supp. 3d at 813, as it has done in anti-discrimination statutes.  *See* 42 U.S.C. § 2000d-7.  But Congress did not abrogate states' sovereign immunity when it enacted 42 U.S.C. § 1983.  *Burk v. Beene*, 948 F.2d 489, 492–93 (8th Cir. 1991).

Mulla also contends that under the doctrine of *Ex Parte Young*[5], immunity does not apply if the plaintiff chooses to sue a state official in his or her official capacity for prospective injunctive relief.  (Pl.'s Mem. at 17) (citing *Seminole Tribe*, 517 U.S. at 73).  While that is true, the *Ex Parte Young* doctrine "does not extend to . . . state agencies." *Monroe v. Ark. State Univ.*, 495 F.3d 591, 594 (8th Cir. 2007).  As a state entity, the University has not waived its Eleventh Amendment immunity.  Accordingly, it is entitled to sovereign immunity on Mulla's § 1983 claims in Counts 2 and 4 of the Amended Complaint.[6]

### b. Section 1983 Liability

In addition, the University argues that Mulla's § 1983 claims fail as a matter of law because the University is not a "person" subject to liability under § 1983.  (Univ. Defs.' Mem. at 10–13.)  Mulla, however, contends that the University is subject to § 1983 liability, citing *Monell v. Department of Social Services*, 436 U.S. 658 (1978).  (Pl.'s Opp'n at 10–11.)

Section 1983 expressly provides:

Every *person* who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or

---

[5]   In *Ex Parte Young*, 209 U.S. 123 (1908), the Supreme Court held that sovereign immunity was inapplicable to suits in federal courts for injunctive relief against officials acting in their official capacity, when the state acted contrary to federal law.

[6]   The University Defendants assert also sovereign immunity with respect to Mulla's state law claims.  (Univ. Defs.' Mem. at 19–20.)  The Court addresses this argument separately in connection with the discussion of Mulla's state law claims.

> immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983 (emphasis added).

In *Will v. Michigan Department of State Police*, 491 U.S. 58, 71 (1989), the Supreme Court held that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." In *Monell*, 436 U.S. at 690, on which Mulla relies, the Supreme Court clarified that municipalities and other local government units may be included "among those persons to whom § 1983 applies." As noted, however, the University is a state entity. *Raygor*, 534 U.S. at 536; *Treleven*, 73 F.3d at 818. As such, it is not a municipality or local government entity subject to § 1983 liability pursuant to *Monell*.

Despite binding authority from the Supreme Court and the Eighth Circuit, Mulla argues that the Court must nevertheless engage in the multi-factor analysis discussed in *Greenwood v. Ross*, 778 F.2d 448 (8th Cir. 1985), to determine whether the University is a state entity. (Pl.'s Opp'n at 16–17.) In particular, he contends that because some of the University's funding comes from federal and private sources, in addition to state funding, the Court must reevaluate whether it is an instrumentality of the state. (*Id.*) But no such "reevaluation" is necessary here because this is not an issue of first impression, and existing precedent dictates the answer. *Treleven*, 73 F.3d at 819 (finding that the district court "had no need to consider the *Greenwood* factors; it had before it the prior decisions of this Court adjudicating the question of the University's relationship with the state."). The University's relationship with the State of Minnesota has not changed in any significant

31

way since the Eighth Circuit observed in 1971 that "the Minnesota Constitution provides that the University of Minnesota is an instrumentality of the state and expressly reserves all immunities to the University." *Id.* (quoting *Walstad*, 442 F.2d at 641) (citing Minn. Const. of 1857 art. VIII, § 3)).

In light of this clear authority, the Court finds that the University is not a "person" under § 1983, and Mulla cannot establish a statutory requirement for such a claim. Therefore, in addition to the applicability of sovereign immunity, the Court finds that Mulla's § 1983 claims against the University fail as a matter of law. Repleading would be futile, as it would not change the fact that the University is a state entity, *see Zutz*, 601 F.3d at 850, and, in any event, Mulla offers no proposed amendments. *K-tel Int'l*, 300 F.3d at 889. Accordingly, Mulla's § 1983 claims against the University in Counts 2 and 4 of the Amended Complaint for violations of Title IX and the Due Process Clause of the Fourteenth Amendment are dismissed with prejudice, and the University Defendants' Motion to Dismiss is therefore granted in this regard.

### 3. First Amendment Retaliation

In Count 10 of the Amended Complaint, Mulla asserts that the University retaliated against him by scheduling the July 23, 2020 dismissal hearing in response to the exercise of his First Amendment right to file this lawsuit. (Am. Compl. ¶¶ 37, 124–25.) The University argues here that Mulla's allegations are belied by the face of the Amended

Complaint, and do not meet the elements of a First Amendment Claim.[7]  (Univ. Defs.'
Mem. at 17–19.)

To state a First Amendment retaliation claim, a plaintiff must allege the following
elements:  "(1) that he engaged in a constitutionally protected activity; (2) that the
defendant took adverse action against him that would chill a person of ordinary firmness
from continuing in the activity; and (3) that the adverse action was motivated in part by
[the plaintiff]'s exercise of his constitutional rights."  *Eggenberger v. W. Albany Twp.*, 820
F.3d 938, 943 (8th Cir. 2016) (quoting *Scheffler v. Molin*, 743 F.3d 619, 621 (8th Cir.
2014)).

Mulla's allegations fail to state a First Amendment retaliation claim.[8]  While the
filing of a lawsuit is generally a protected activity under the First Amendment sufficient to
plead the first element of a retaliation claim, Mulla must also plausibly allege that the
University took adverse action against him in order to meet the second element of a claim.

---

[7]     At the hearing on the instant motion, counsel for the University also argued that
sovereign immunity under the Eleventh Amendment applies to Mulla's First Amendment
retaliation claim.  In its memoranda, however, it did not raise sovereign immunity with
respect to this claim. (*See* Univ. Defs.' Mem. at 16–19; Reply [Doc. No. 42] at 3–4.) While
sovereign immunity appears to apply for the same reasons discussed in the context of
Mulla's § 1983 claims, the Court will address the parties' arguments concerning the First
Amendment retaliation claim under Rule 12(b)(6) because that was the basis for the
University's motion on this claim.

[8]     The Court notes that Mulla's retaliation allegations are factually inconsistent.  In
Count 10, he alleges that he received notice of the dismissal hearing on June 5, 2020, two
days after filing this lawsuit.  (Am. Compl. ¶ 125.)  Mulla filed the lawsuit on April 13,
2020.  Elsewhere in the Amended Complaint, Mulla alleges that he received notice of the
hearing two days after the University Defendants were served with this lawsuit.  (*Id.* ¶ 37.)
The docket reflects that service of process on the University Defendants was effected on
June 3, 2020.  (*See* Univ. Defs.' Waiver of Serv. [Doc. No. 9].)

*Eggenberger*, 820 F.3d at 943.  Mulla alleges that the University's adverse action was "moving for a dismissal hearing prior to the [EOAA's Title IX] investigation being completed on June 9th, 2020."  (Am. Compl. ⁋ 126.)  The Eighth Circuit has held that notice of a hearing is not a legally cognizable adverse action.  *Charleston v. McCarthy*, 926 F.3d 982, 989 (8th Cir. 2019).  In other words, the act of scheduling a hearing is not "a tangible change in . . . conditions that produces a material . . . disadvantage." *Id.* Moreover, upon receiving notice of his immediate suspension in November 2019 for violating a condition of his academic reinstatement, Mulla himself requested that a hearing be scheduled.  (Am. Compl. ⁋⁋ 30, 33.)  The Court finds that these allegations fail to plausibly allege that the University took adverse action against Mulla.

The second element of a First Amendment retaliation claim also requires Mulla to plausibly allege that the scheduling of a dismissal hearing would deter an ordinary person from filing a lawsuit.  *Eggenberger*, 820 F.3d at 943.  Nothing about the University Defendants' conduct would deter an ordinary person from filing a lawsuit.  Indeed, Mulla does not allege that the University Defendants did anything to chill his right to file a lawsuit.  *See id.* ("[T]he Township did not do anything to chill Eggenberger's right to public speech, but instead infringed his ability to access documents, which is not a constitutionally protected right.").  Accordingly, Mulla fails to plausibly allege any chilling effect on his constitutionally protected activity of filing a lawsuit.

Nor does Mulla plausibly allege the third element of a claim for First Amendment retaliation—that "the adverse action was motivated in part by [the plaintiff]'s exercise of his constitutional rights."  *Id.*  His only allegation to this effect is that "[t]he University

34

retaliated against Mr. Mulla by moving for a dismissal hearing prior to the [EOAA's Title

IX] investigation being completed on June 9th, 2020."   (Am. Compl. ¶ 126.)   This

conclusory statement, unsupported by any facts, cannot defeat a Rule 12(b)(6) motion.

*Glick*, 944 F.3d at 717.  The temporal connection that Mulla asks the Court to infer is belied

by the fact that Mulla filed the lawsuit two months before the scheduling of the hearing.[9]

*See Tyler v. Univ. of Ark. Bd. of Trs.*, 628 F.3d 980, 986 (8th Cir. 2011) ("As more time

passes between the protected conduct and the retaliatory act, the inference of retaliation

becomes weaker and requires stronger alternate evidence of causation.   The inference

vanishes altogether when the time gap between the protected activity and the adverse . . .

action is measured in months." (internal citations omitted).  The Court therefore finds that

Mulla fails to sufficiently allege the third element of a First Amendment retaliation claim.

For all of these reasons, the Court finds that Mulla fails to state a First Amendment

Retaliation claim under Rule 12(b)(6).  Accordingly, the University Defendants' Motion

to Dismiss is granted as to this claim.  Given the facts here, repleading would not cure the

deficiencies, and would be futile.  *Zutz*, 601 F.3d at 850.  Nor does Mulla offer any

---

[9]       Moreover, many months before Mulla's April 2020 legal filing and his June 2020 notice of the dismissal hearing, he was on notice that he was subject to a dismissal hearing. The November 14, 2019 email from Dr. Kim to Mulla communicated his immediate suspension, and reminded Mulla that as a condition of his August 1, 2019 reinstatement, "any further professionalism concern [would] result in [his] immediate suspension and dismissal hearing."  (Pl.'s Ex. D at 51; Pl.'s Ex. A at 3.)  And again, Mulla alleges that in November 2019, he formally requested a hearing to address the allegations that lead to his suspension.  (Am. Compl. ¶ 30.)  Thus, the scheduling of a dismissal hearing was long contemplated, as alleged in the pleadings and attached exhibits. These facts show that regardless of whether Mulla filed a lawsuit, and certainly long before he actually filed the lawsuit or effected service of process, he anticipated—and requested—a dismissal hearing.

proposed amendments.  *K-tel Int'l*, 300 F.3d at 889.  Count 10 of the Amended Complaint is therefore dismissed with prejudice.

### C.  Federal Claim Against Dr. Kim

As noted, Mulla asserts a § 1983 claim against Dr. Kim in his official and individual capacities.   In Count 3 of the Amended Complaint, Mulla asserts that Dr. Kim violated Mulla's due process rights under the Fourteenth Amendment by failing to afford him a "meaningful, prompt opportunity to be heard before an impartial decision maker," and, without proper notice or an opportunity to be heard, "executed the decision to suspend and ban Mr. Muller from the University of Minnesota."  (Am. Compl. ¶¶ 78–79.)  Dr. Kim argues that this claim should be dismissed for the following reasons:  (1) sovereign immunity bars the portion of the claim asserted against Dr. Kim in his official capacity for which Mulla seeks monetary damages, and when acting as an official state actor, Dr. Kim is not a "person" subject to § 1983 liability; (2) Mulla has failed to exhaust his administrative remedies; (3) he has not alleged the essential elements of a due process violation; and (4) even if he had alleged a prima facie claim, it is barred by the doctrine of qualified immunity.  (Univ. Defs.' Mem. at 12 n.5, 21–27.)

### 1. Eleventh Amendment and Section 1983 Liability

As noted, under the Eleventh Amendment, litigants may not file federal lawsuits for monetary damages against individual state officers in their official capacities "because such lawsuits are essentially for the recovery of money from the state."  *Raymond*, 140 F. Supp. 3d at 813–14 (citing *Treleven*, 73 F.3d at 818) (quotation omitted).  Also, state officials acting in their official capacities are not "persons" under § 1983.  *Treleven*, 73 F.3d at 818

(citing *Will*, 491 U.S. at 71). Here, not only does sovereign immunity apply, but Dr. Kim is also not a "person" subject to § 1983 liability when sued in his official capacity for monetary damages. Accordingly, because he is not a "person" subject to liability under the statute, the official-capacity portion of Mulla's § 1983 claim against Dr. Kim for which Mulla seeks monetary damages is dismissed with prejudice.

The Court therefore considers below the portion of Mulla's official capacity claim against Dr. Kim for which Mulla seeks prospective injunctive relief, as well as the individual capacity portion of the claim.

### 2. Exhaustion

"Under federal law, a litigant asserting a deprivation of procedural due process must exhaust state remedies before such an allegation states a claim under § 1983." *Hopkins v. City of Bloomington*, 774 F.3d 490, 492 (8th Cir. 2014) (citations omitted). As stated in the dismissal decision letter from the COSSS, Mulla had 10 days in which to appeal to the COSSS if he possessed new information not reasonably available to the COSSS when it reached its decision. (Pl.'s Ex. O at 96.) The COSSS also informed Mulla that he could file a student academic complaint, if he believed that the decision involved a violation of a University rule, policy, or established practice. (*Id.*) Mulla did not do so, nor does he allege that he did so.

Instead, he argues in opposition to the instant motion that any administrative appeal would have been futile and certain to fail, because it could not bring about "a reversal of the 'professionalism concerns' finding by the COSSS." (Pl.'s Opp'n at 20) (citing *Brown v. J.B. Hunt Transp. Servs., Inc.*, 586 F.3d 1079, 1085 (8th Cir. 2009)). Relying on

*McCarthy v. Madigan*, 503 U.S. 140 (1992), Mulla states that "where the process is useless, damaging, or a sham, the exhaustion requirement is excused." (*Id.* at 21.) He contends that "[t]he [University's] procedure for handling sexual harassment complaints creates an illusion of fairness, as it provides the mere appearance of due process, but the medical school ignores its own investigative findings making arbitrary decisions." (*Id.*)

Again, Mulla conflates the EOAA's Title IX sexual harassment investigation with the COSSS' academic dismissal proceeding. Separate from the EOAA's sexual harassment investigation, the COSSS evaluated Mulla's conduct from an academic professionalism standpoint. (Pl.'s Ex. O at 95–96.) While Mulla argues that the University Defendants ignored investigative findings and made arbitrary decisions, the COSSS acknowledged the EOAA's conclusion that Mulla had not committed sexual harassment. (*Id.* at 91.) However, the COSSS noted that the EOAA made findings of fact that raised professionalism concerns. (*Id.*) On July 23, 2020, the COSSS held a full-blown dismissal hearing with witnesses who were subject to cross examination. (Am. Compl. ¶¶ 42–43.) On August 18, 2020, the COSSS issued a written decision, explaining the basis for Mulla's dismissal and his rights to appeal. (Pl.'s Ex. O at 91–97.) Contrary to Mulla's argument, there was no "sham procedure," nor did the University "ignore" its own investigative findings and make arbitrary decisions. (Pl.'s Opp'n at 20–21.) The allegations in the Amended Complaint and information found in the exhibits to the Amended Complaint do not support Mulla's argument that he should be excused from exhausting his administrative remedies.

Fundamentally, Mulla does not allege in the Amended Complaint that the University's administrative review process would have been incapable of reversing the COSSS finding, or "that the final outcome of the process would have been adverse to him." *Raymond v. Bd. of Regents of Univ. of Minn.*, 847 F.3d 585, 591–92 (8th Cir. 2017). Instead, he "only speculates that the outcome would have been adverse to his position, which is insufficient to excuse his voluntary failure to exhaust his administrative remedies." *Groenewold v. Kelley*, 888 F.3d 365, 373 (8th Cir. 2018) (citing *Raymond*, 847 F.3d at 592).

Accordingly, the Court finds that Mulla failed to administratively exhaust his procedural due process administrative remedies. However, because Mulla also asserts a substantive due process claim, and because the Court finds that his procedural and substantive due process claims independently fail to state a claim for relief, the Court addresses them below.

### 3. Elements of Due Process Claim

The Due Process Clause prohibits the deprivation of "life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The clause has two components: procedural due process and substantive due process. *Singleton v. Cecil*, 176 F.3d 419, 424 (8th Cir. 1999). "Analysis of either a procedural or substantive due process claim must begin with an examination of the interest allegedly violated, and the possession of a protected life, liberty, or property interest is a condition precedent to any due process claim. Where no such interest exists, there can be no due process violation." *Id.* (quotations and citations omitted); *accord Senty–Haugen v. Goodno*, 462 F.3d 876, 886 (8th Cir. 2006)

("A procedural due process claim is reviewed in two steps. The first is whether [the plaintiff] has been deprived of a protected liberty or property interest.").

In the Amended Complaint, Mulla asserts violations of both substantive and procedural due process. (Am. Compl. ¶¶ 72, 75–76.) He alleges the deprivation of a "property right[] to attend a public school," (*id.* ⁋ 75), and "a liberty interest in his good name, reputation, honor, property and integrity." (*Id.* ¶ 76.)

As to Mulla's alleged property right to attend a public school, our sister court in *Doe v. University of Nebraska*, 451 F. Supp. 3d 1062, 1110 (D. Neb. 2020), recently observed that "[n]either the Supreme Court nor the Eighth Circuit has clearly established that continued enrollment in a post-secondary education program is a property or liberty interest protected by the Fourteenth Amendment's guarantee of substantive due process," although a state may create such a property interest. When confronting similar claims in the university-dismissal context, the Eighth Circuit has simply assumed without deciding the existence of such a property interest. *See Monroe*, 495 F.3d at 594–95 (assuming without deciding that the plaintiff's interest in pursuing his education constituted a constitutionally protected interest) (citing *Bd. of Curators of the Univ. of Mo. v. Horowitz*, 435 U.S. 78, 84–85 (1978) (same)).

Mulla relies on *Doe v. Purdue University*, 928 F.3d 652 (7th Cir. 2019), stating that there, the Seventh Circuit "determined that the student adequately alleged that Purdue [University] deprived him of a liberty interest in his education." (Pl.'s Opp'n at 30.) Even if the Court were obliged to follow Seventh Circuit precedent, Mulla's statement is simply wrong. In *Purdue University*, the court stated that while K-12 students have a property

40

interest in their public education because state law entitles them to receive one, "[t]he same is not true . . . of students at public universities." *Id.* The Seventh Circuit therefore rejected the plaintiff's argument that the Due Process Clause "protects a generalized property interest in higher education, irrespective of any specific state entitlement."[10] *Id.* at 660. Mulla's allegations in the Amended Complaint are precisely those rejected by Seventh Circuit in *Purdue University*. (Am. Compl. ⁋ 76) (alleging the deprivation of a generalized property interest in "attend[ing] a public school.").

In any event, while no binding precedent expressly recognizes a constitutionally protected property interest in continuing one's education at a public university, the Court will follow the Eighth Circuit's guidance in assuming without deciding that such a right exists. *See Monroe*, 495 F.3d at 594–95 (citing *Horowitz*, 435 U.S. at 84–85).

As to one's good name and reputation, the Eighth Circuit has recognized that the Due Process Clause protects such a liberty interest. *Kyles v. E. Neb. Human Servs. Agency*, 632 F.2d 57, 61 (8th Cir. 1980) (citations omitted). Here, Mulla has pleaded, albeit in conclusory fashion, that he has a Fourteenth Amendment right "to substantive and procedural due process before the State can take action that alters or extinguishes Mr. Mulla's legal status in a way that deprives him of a liberty interest in his good name,

---

[10]    While the court in *Purdue University* found no generalized property interest in a public university education, it found that the plaintiff sufficiently alleged the deprivation of a protected liberty interest "in the freedom to pursue naval service, his occupation of choice." 928 F.3d at 661. The court's analysis of this liberty interest involved consideration of whether the plaintiff had alleged state-inflicted reputational damage along with an altered legal status that deprived him of a previously-held right. *Id.* (citations omitted).

reputation, honor, property and integrity." (Am. Comp. ℙ 76.) He alludes to reputational harm and public stigma for "being falsely cast as a stalker." (*Id.* ℙℙ 47, 49.) While Mulla fails to allege any additional facts in support of his general allegation of reputational harm, for purposes of the Court's analysis, again, it will simply assume without deciding that he has alleged the existence of a protected property or liberty interest. *See Monroe*, 495 F.3d at 594–95 (citing *Horowitz*, 435 U.S. at 84–85).

### a. Substantive Due Process

"The theory of substantive due process is properly reserved for truly egregious and extraordinary cases." *Mills v. City of Grand Forks*, 614 F.3d 495, 498 (8th Cir. 2010) (quotation omitted). "Such a high standard is necessary 'lest the Constitution be demoted . . . to a font of tort law.'" *Der v. Connolly*, 825 F. Supp. 2d 991, 998 (D. Minn. 2010) (alteration in original) (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n. 8 (1998)). "A plaintiff must establish the government action complained of is truly irrational, that is something more than arbitrary, capricious, or in violation of state law. Truly irrational conduct is conscience shocking in a constitutional sense." *Mills*, 614 F.3d at 498 (quotations and citation omitted).[11] In the specific context of academic dismissal, the Eighth Circuit has held that a substantive due process violation "is proved only if there was no rational basis for the university's decision, or if the decision was motivated by bad faith

---

[11] "Because the conscience-shocking standard is intended to limit substantive due process liability, it is an issue of law for the judge, not a question of fact for the jury." *Sitzes v. City of W. Memphis, Ark.*, 606 F.3d 461, 467 (8th Cir. 2010) (quotation omitted).

or ill will unrelated to academic performance." *Ikpeazu v. Univ. of Neb.*, 775 F.2d 250, 253 (8th Cir. 1985) (citations omitted).

Mulla fails to plausibly allege factual allegations against Dr. Kim that meet this high standard. He alleges that Dr. Kim violated his substantive due process rights by: (1) failing to "[give] notice and a meaningful, prompt opportunity to be heard before an impartial decision maker"; (2) "execut[ing] the decision to suspend and ban Mr. Mulla from the University of Minnesota without affording him any hearing or opportunity to respond"; and (3) "email[ing] the student body asking for additional reports . . . to solicit additional complaints and preemptively convict Mr. Mulla in the court of public opinion." (Am. Compl. ¶¶ 5, 78.) This alleged conduct, however, is belied by Plaintiff's other allegations and the facts presented in his exhibits to the Amended Complaint.

As to Mulla's allegations that Dr. Kim failed to provide notice and a meaningful opportunity to be heard, (*id.* ¶ 78), the documents embraced by the pleadings indisputably contradict that claim. They show that Mulla had a history of professionalism violations such that his readmission to the Medical School was expressly conditioned on future compliance with professionalism expectations. (*Id.* ¶ 18; Pl.'s Ex. A at 3.) He was clearly on notice of that condition as of August 1, 2019, when the Medical School reinstated him as a student. (Am. Compl. ¶¶ 17, 18; Pl.'s Ex. A at 1–4.) Also, as of August 1, 2019, Mulla was clearly on notice that the consequence for committing any further professionalism concerns would result in immediate suspension and a dismissal hearing. (Am. Compl. ¶ 18; Pl.'s Ex. A at 3.)

As the Medical School's Assistant Dean for Student Affairs, Dr. Kim explained to Mulla in a November 14, 2019 email that "multiple students" had "raised concerns that you have exhibited unprofessional behavior including inappropriate touching, asking inappropriate personal questions, and potential stalking." (Pl.'s Ex. D at 51.) Citing the terms of Mulla's August 1, 2019 readmission letter, Dr. Kim placed Mulla on suspension for these professionalism concerns. (*Id.*) Mulla's allegation that Dr. Kim failed to inform him of the allegations against him is disproved by the November 14, 2019 email, which summarized the concerns. Dr. Kim's actions in suspending Mulla were entirely consistent with the condition of Mulla's reinstatement to the Medical School.

Likewise, Mulla's allegation that he was suspended without the ability to respond is overwhelmingly refuted by his other allegations and exhibits to the Amended Complaint. After receiving reports from medical students regarding Mulla's concerning conduct, Dr. Kim reported the information to the EEOA on November 20, 2019. (Pl.'s Ex. B at 12.) Mulla does not plausibly allege that reporting the information to the EOAA legally rises to the level of being irrational or conscious shocking, as the students' allegations raised concerns of possible sexual harassment, and the EOAA was the University entity charged with investigating such reports. (*See* Am. Compl. ℙ 22) (alleging that the EOAA conducted investigations into violations of the University's Code of Conduct regarding sexual harassment).

Nor does Mulla plausibly allege that it was irrational or conscious shocking for the Medical School to allow the EOAA's Title IX investigation to proceed before the COSSS initiated separate academic dismissal proceedings. The EOAA conducted a "detailed and

44

lengthy investigation that lasted over 200 days," (*id.* ¶ 36), and allowed Mulla a full opportunity to respond to all of the allegations against him, as reflected in the EOAA's report. (Pl.'s Ex. B at 6–47.) On June 9, 2020, the EOAA issued its findings, clearing Mulla of sexual harassment violations under the University Code of Conduct. (*Id.*) After the conclusion of the EEOA's separate proceedings, the COSSS held an academic dismissal hearing regarding potential professionalism concerns. (Pl.'s Ex. O at 91–97.) Mulla received written notice of the July 23, 2020 hearing 10 days in advance, and he attended the hearing with his counsel. (*Id.* at 91.) He gave a statement, and witnesses were subject to direct and cross examination. (*Id.*) Thus, Mulla's allegation that Dr. Kim failed to provide Mulla with notice and an opportunity to be heard, and that he suspended Mulla from the Medical School without affording him an opportunity to respond is utterly contradicted by Mulla's other allegations and the facts presented in his exhibits to the Amended Complaint. It cannot, therefore, support an allegation of conscience-shocking, irrational action. Nor does Plaintiff plausibly allege that Dr. Kim's conduct was motivated by bad faith or ill will, unrelated to professionalism concerns.

Finally, Plaintiff's allegation that in a December 9, 2019 email, Dr. Kim solicited negative feedback from medical students about Mulla (Am. Compl. ¶ 5), is also contradicted by the very contents of the document, which Mulla attached as an exhibit to the Amended Complaint. In the email, Dr. Kim acknowledged that he had received reports from several students who had received anonymous text messages either warning of or accusing individuals of inappropriate behavior. (Pl.'s Ex. C at 49].) Dr. Kim noted that such conduct could be considered harassment, or if coming from a medical student, a

violation of professionalism, and asked students to report any such communications.  (*Id.*)
The email did not identify Mulla by name.  (*Id.*)  Mulla does not plausibly allege that Dr.
Kim's conduct in sending the email was conscious-shocking, or arbitrary or capricious.
Nor do any of Mulla's allegations plausibly allege that Dr. Kim's action in sending the
email was motivated by bad faith or ill will, unrelated to his professionalism concerns.  As
the Medical School's Assistant Dean for Student Affairs, he was required to respond to
students' concerns.

For all of the foregoing reasons, the Court finds that Plaintiff fails to plausibly allege
a substantive due process claim, and the University Defendants' Motion to Dismiss this
claim is granted.  Under these facts, repleading would not cure the deficiencies, *see Zutz*,
601 F.3d at 850, nor has Mulla offer any proposed amendments.  *K-tel Int'l*, 300 F.3d at
889.  Accordingly, Mulla's substantive due process claim against Dr. Kim in Count 3 is
dismissed with prejudice.

### b. Procedural Due Process

A procedural due process claim requires a two-step analysis.  *Krentz v. Robertson*,
228 F.3d 897, 902 (8th Cir. 2000).   After demonstrating that the state deprived Mulla of a
protected interest—which, again, the Court assumes without deciding here—he "must
establish that the state deprived him of that interest without sufficient 'process.'"  *Id.*
Again, Mulla's due process claim against Dr. Kim alleges that he failed to give notice and
a prompt opportunity to be heard before an impartial decision maker, suspended Mulla
without giving him an opportunity to be heard, and solicited negative feedback about Mr.
Mulla.  (Am. Compl. ¶¶ 5, 78.)

46

The nature of an educational dismissal bears on the type of process that is due.  In *Horowitz*, the Supreme Court stated that dismissals for academic deficiencies require less due process than dismissals for disciplinary reasons.  435 U.S. at 86, 89–90.  The Court noted the "significant difference between the failure of a student to meet academic standards and the violation by a student of valid rules of conduct," finding that the difference "calls for far less stringent procedural requirements in the case of an academic dismissal."  *Id.* at 86.  Relying on *Horowitz*, the Eighth Circuit requires a notice requirement and a "careful and deliberate" standard for academic dismissals, but not a hearing.  *Monroe*, 495 F.3d at 595.

As to whether Mulla's dismissal was for academic reasons, the COSSS considered it an academic dismissal.  (Pl.'s Ex. O at 96.)  Mulla contends that the COSSS merely labeled his dismissal as academic, but it was actually disciplinary.  (Pl.'s Opp'n. at 21–27.)  In opposition to this motion, he asserts that the Chair of the COSSS, Dr. Sheila Specker, phoned him shortly after the hearing to relay the results, and stated that his dismissal was disciplinary in nature.  (*Id.* at 8.)

The Supreme Court has observed that a "variety of factors" may relate to a student's academic proficiency and bear on "a school's determination of whether a student will make a good medical doctor."  *Horowitz*, 435 U.S. at 91 n.6.  Thus, courts have found some dismissals to be "academic" in nature "when the student's deficiencies, while arguably warranting disciplinary action, also bear on academic performance."  *Monroe*, 495 F.3d at 595 (citing *Horowitz*, 435 U.S. at 91 n.6) (personal hygiene and timeliness affecting academic aptitude of medical student); *Richmond v. Fowlkes*, 228 F.3d 854, 858 (8th Cir.

47

2000) (inappropriate behavior in class, tardiness, and inappropriate interaction with instructors contributing to academic deficiencies). While Mulla refers to a subsequent phone conversation in which Dr. Specker allegedly stated that his dismissal was disciplinary in nature, (Pl.'s Opp'n at 8), he makes no such allegation in the Amended Complaint.

As noted, the Eighth Circuit requires notice and a "careful and deliberate" standard for academic dismissals. *Monroe*, 495 F.3d at 595. As to notice, it is undisputed in the records embraced by the pleadings, that upon learning of medical students' concerns about Mulla's conduct, Dr. Kim suspended Mulla and informed him of the nature of the professionalism concerns, which was entirely consistent with the terms of Mulla's readmission to the Medical School. (Pl.'s Ex. D at 51.) Mulla could not and does not plausibly allege that he was not on notice of those conditions, as of August of 2019. (See Pl.'s Ex. A at 3) (conditioning reinstatement on a lack of future professionalism concerns).

Mulla received specific notice of the COSSS hearing 10 days in advance of the hearing and was informed that the hearing involved professionalism concerns. (Pl.'s Ex. O at 91.) Mulla was also aware that while the EOAA's Title IX investigation had cleared him of sexual harassment violations under the University Code of Conduct, the EOAA had made factual findings about his conduct that flagged professionalism concerns with the Medical School. (Pl.'s Ex. B at 36–47.)

Importantly, while a formal hearing is not required for an academic dismissal, *see Horowitz*, 435 U.S. at 89–90, it is uncontested that Mulla actually received a formal hearing. At that hearing, he was free to contest any of the findings from the EOAA or any

of the evidence presented at the COSSS hearing, and present his own evidence and testimony, which he did.  (Pl.'s Ex. O at 91–94.)  He has not plausibly alleged otherwise.

Moreover, Mulla cannot plausibly allege that the members of  COSSS failed to make a "careful and deliberate" decision on his dismissal.  *Monroe*, 495 F.3d at 595.  It is undisputed that the COSSS found by a majority vote that Mulla's conduct constituted a professionalism violation, and found by a separate majority vote, that dismissal was warranted.  (Pl.'s Ex. O at 96.)  The COSSS formalized its decision in a seven-page letter that carefully explained its process and decision.  (*Id.* at 91–97.)  Moreover, the COSSS advised Mulla of his right to appeal its decision and the means by which to do so.  (*Id.* at 96.)

Notably, Mulla does not allege that Dr. Kim was involved in the COSSS hearing or dismissal decision.  In fact, the exhibits to the Amended Complaint show that Dr. Kim was not a member of the COSSS.  (See Pl.'s Ex. H at 60) (listing COSSS membership).   Mulla cites no authority supporting his position that, under these facts, Dr. Kim violated his procedural due process rights.[12]

Accordingly, for all of the foregoing reasons, the Court finds that Plaintiff fails to state a procedural due process claim against Dr. Kim.  The University Defendants' Motion

---

[12]     In the Amended Complaint and in his opposition memorandum, Mulla raises several issues involving the hearing, all of which, he contends, contributed to a due process violation.  (Am. Compl. ¶¶ 38–43; Pl.'s Opp'n at 6–7.)  For example, he refers to the provision of allegedly prejudicial material to the COSSS, the "hearsay testimony" of Ms. Weston, and that his counsel was rushed or cut off in his questioning of witnesses.  (Am. Compl. ¶¶ 38–43; Pl.'s Opp'n at 6–7.)  None of these allegations or arguments involve Dr. Kim, nor do they support a due process violation.  (*See* Sept. 3, 2020 Order at 12–17.)

to Dismiss this claim is therefore granted. Under these facts, repleading would not cure the deficiencies, *see Zutz*, 601 F.3d at 850, nor has Mulla offer any proposed amendments. *K-tel Int'l*, 300 F.3d at 889. Accordingly, Mulla's procedural due process claim against Dr. Kim in Count 3 is dismissed with prejudice.

### 4. Qualified Immunity

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Monroe*, 495 F.3d at 594 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (alteration in original)). To determine whether Dr. Kim is entitled to qualified immunity, the court must consider whether (1) Mulla alleges facts showing the violation of a constitutional right by Dr. Kim, and (2) the "right was clearly established at the time such that a reasonable person would have known that his conduct violated the law." *Id.* (citation omitted). For all of the reasons discussed above, Mulla has not stated a plausible due process violation by Dr. Kim. Accordingly, regardless of whether the right was clearly established at the time, Dr. Kim is entitled to qualified immunity.

### D. Remaining State Law Claims

Having dismissed Mulla's federal claims, Mulla's state law claims against the University, Dr. Kim, and Ms. Weston remain. Mulla asserts the following state law claims: negligence against Dr. Kim and the University (Counts 5 and 8, respectively), defamation against Dr. Kim and Ms. Weston (Counts 6 and 7, respectively), breach of contract against the University (Count 9), intentional infliction of emotional distress against the University

and Dr. Kim (Counts 11 and 12, respectively), negligent infliction of emotional distress against the University (Count 13), and estoppel and reliance against the University (Count 14).

Subject matter jurisdiction in this case is based on the existence of a federal cause of action. Jurisdiction over Mulla's state law claims rests exclusively on supplemental jurisdiction under 28 U.S.C. § 1367, which confers jurisdiction over state claims that form part of the same "case or controversy" as the federal claims. When a Court has dismissed all of a plaintiff's federal claims over which it has original jurisdiction, it has the discretion to decline to exercise supplemental jurisdiction over the remaining state law claims. 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if— . . . (3) the district court has dismissed all claims over which it has original jurisdiction"); *Wilson v. Miller*, 821 F.3d 963, 970 (8th Cir. 2016). In deciding whether to exercise supplemental jurisdiction over pendent state law claims, courts consider the factors of judicial economy, convenience, fairness, and comity. *Wilson*, 821 F.3d at 970–71 (citing *Carnegie-Mellon Univ. v. Cahill*, 484 U.S. 343, 350 (1988)). Here, in terms of judicial economy, the Court has dismissed Mulla's federal claims well before trial, and none of the other factors weigh in favor of retaining jurisdiction. Accordingly, the Court dismisses Mulla's state law claims, including his claim against Ms. Weston, without prejudice.[13]

---

[13]    Because the Court dismisses these claims on the basis of supplemental jurisdiction, it does not address the University's sovereign immunity argument regarding the state law claims.

### III.    ORDER

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY**

**ORDERED** that:

1. The Motion to Dismiss filed by the University of Minnesota, the Regents of the University of Minnesota, and Dr. Michael Kim [Doc. No. 31] is **GRANTED**.

2. The claims asserted in Counts 1, 2, 3, 4, and 10 of the Amended Complaint are **DISMISSED WITH PREJUDICE**.

3. The Court declines to exercise supplemental jurisdiction over the remaining state law claims.  Accordingly, the claims asserted in Counts 5, 6, 7, 8, 9, 11, 12, 13, and 14 of the Amended Complaint are **DISMISSED WITHOUT PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Dated:  February 16, 2021                             s/Susan Richard Nelson
                                                      SUSAN RICHARD NELSON
                                                      United States District Judge